## Hobbs v. Bibb.

1. Possession of personal property, remaining with the vendor, is presumptive evidence of ownership in him; but this presumption may be rebutted by proof.
2. Such possession is only presumptive evidence of fraud, but is not fraud *per se.*

Thomas Bibb obtained a judgment in the county Court. of Madison county, against John Estell and John Bradley, in February 1827, for $2213 04; on which a *fi fa* issued the 26th of February 1827, which was levied on the next day on four negroes, besides other effects, as the property of John Estell. On the 28th of March the said slaves were

claimed by John Hobbs, who made affidavit and gave bond according to statute. The proceedings were returned to the Circuit Court of Madison, for the trial of the right of property. At May term 1827, issue was joined, between the plaintiff in execution, and the claimant of the property; Bibb averring that the negroes were liable to the satisfaction of his execution as the property of John Estell, and Hobbs denying the same, and insisting they were his. The issue was tried by a jury, who found "that at the time of the levy, the negroes were the property of the firm of John and Joseph Estell; and that one undivided half thereof being John Estell's interest therein, was subject to the execution:" on which the Court rendered judgment, subjecting said undivided half to the satisfaction of said execution, and for the costs, against the claimant.

Hobbs took a bill of exceptions at the trial, by which it is shewn that his claim was under a purchase made by him from John and Joseph Estell. He proved that in August 1825, he lent J. and J. Estell $2500, and took their note payable on demand for the repayment; that in November following, he purchased from them the four negroes levied on, and four others, and took a bill of sale for them and gave up the note for $2500 in part payment, the whole price being $2700. That at the time of the sale, John Estell hired the negroes from Hobbs, and continued in possession under said contract of hire until January 1827, when the hire, $250 was paid, and Hobbs took possession of four of the negroes, and again hired the four now in dispute to said John Estell for the year 1827, for $200, and took his note for the payment. It was proved that the Estell's were in partnership in all their transactions, and had been for several years; and that the negroes sold to Hobbs were partnership property, and sold to him to pay a partnership debt, the firm being indebted to him for other loans of money to more than the remaining amount of two hundred dollars, after deducting the note for $2500. J. and J. Estell were in good credit, and transacted business extensively in Huntsville as auctioneers, brokers and commission merchants for several years; that in the fall and winter of 1824-5 they bought cotton largely, and sold it in New-Orleans at considerable profit, and afterwards vested the proceeds, and extended their credit in the purchase of a large quantity of Cotton at New Orleans, which they shipped to Liverpool on speculation. At the time of borrowing the $2500 from Hobbs, the fall of cotton in

England was not known or anticipated, but before the sale of the negroes in November, such information of the fall of cotton in England had been received as to induce the Estell's to entertain general fears that they must fail, and under these apprehensions, they proposed to Hobbs to sell him the negroes for the cash he had loaned them. Their fears were realised, the loss on the cotton caused them to fail for a large amount. It was proved also, that the debt of Bibb was for money borrowed for and applied to the use of the firm. On this evidence the Court charged the jury, that although no fraud may have been intended by the parties, and although a fair price may have been actually paid by Hobbs, and although the contract of hire from Hobbs to Estell might be also *bone fide*, for a fair price and without intentional fraud; yet that the possession of the property remaining with Estell, was fraud of itself as to creditors, &c: and rendered the title of Hobbs inoperative as to the interest of John Estell; but as to the interest of Joseph Estell, as he was not a defendant in the execution, Hobb's title would be good against the present plaintiff. The counsel for the claimant moved the Court to instruct the jury further, that if they believed the firm of J. and J. Estell was insolvent, that the judgment creditors of John Estell would have no right to levy on the property of the firm; but the Court refused so to charge, and on the contrary, instructed them that a creditor of any member of a firm had a right to levy on the effects thereof, to the extent of his debtors interest, if his execution was in the sheriff's hands before that of the creditors of the firm; and that insolvency made no difference. To all which Hobbs excepted.

The instructions given, and the refusal to give those requested, as shewn in the bill of exceptions, were, among other matters, assigned for error by Hobbs, the claimant, in this Court.

KELLY and HUTCHISON, for the appellant.

HOPKINS, for the defendant in error.

The cause was argued at July term 1828, and held under advisement till this term, when the opinion of the Court was delivered

By CHIEF JUSTICE LIPSCOMB. On the trial the Judge charged the jury, "That although the sale might

have been *bona fide*, and the hiring in good faith, and Hobbs actually have received the wages for which they were hired, yet, *as the possession had never been changed, it was void,* and the property was subject to the execution levied on it." The correctness of this charge we are now called on to consider. The main question presented is not a new one; it has given rise to much discussion, and a great contrariety of decision. It is whether the possession remaining with the vendor, after an absolute sale, is a fraud *per se,* or only *prima facie* evidence of fraud. Our statute is not materially different in its terms from the 13th Elizabeth: The adjudications of the English Courts may, therefore, be resorted to, and if they have been uniform in the construction of that statute, and correspond with the current of decisions on the same subject in this country, so as to have made a settled rule of law, it would be very impolitic and pernicious in its consequences to disturb it; however much we might be disposed to question its correctness, if it was *res integra.* Contracts, and the various transactions of mankind in business and trade, are supposed to be entered into, with a corresponding view to the law as it has been decided by the highest judicial tribunals of the country. A sudden subversion of a well estabed rule of law, might materially affect the relations of debtor and creditor, by dissolving liabilities entered into in the best faith. We will first inquire how far the decisions on this subject have been uniform in the English Courts. Those who maintain the affirmative of the proposition, insist, that the statute of Elizabeth is only in affirmation of the common law; that it is a well established principle of the common law, that possession remaining with the vendor is fraud *per se.* In Sheppard's Touchstone[a] the rule is laid down, that "If a debtor secretly make a general deed of his goods to one of his creditors, and continue in the use and occupation of the goods as his own, the deed is fraudulent and void against a subsequent judgment creditor, notwithstanding the deed was made on good consideration." There can be no doubt but that the ground of this rule is, that the secrecy of the transaction gave a false coloring to the circumstances and solvency of the vendor, and that such delusive appearances might well give a credit, that would otherwise be refused. But a previous creditor would not be in the same predicament; he could not be so much injured if the sale had been for a good consideration, because the debtor had a right to prefer one creditor to another. The

JULY 1829.

Hobbs
v.
Bibb.

*a* Page 66.

JULY 1829.

Hobbs
v.
Bibb.

reasonableness of this rule of the common law seems to be well founded. If, however, the broad ground that possession remaining with the vendor is fraud *per se*, be correct, it would be void both as to subsequent and prior creditors, whether they had been deluded by false appearances or not; this never has been ruled at common law, all the decisions going that length have been subsequent to the statute of 13th Elizabeth. It is worthy of remark that Twyne's case[a] so often referred to, was not a civil suit at common law for the ascertainment of a contested right between two individuals, but it was a proceeding *criminaliter;* an information at the instance of the attorney general for a fraud supposed to have been committed by Twyne, on the other creditors of Pierce, in setting up and publishing a fraudulent gift of the goods in question; and so far as the 13th Elizabeth sec. 5. could be brought to bear on the prosecution was for his benefit, he attempted to defend himself by shewing, that the conveyance from Pierce was protected by the statute, because it was founded on a good consideration. The sale however had been secret, and Pierce continued to exercise ownership of the property alledged to have been sold, such as shearing the sheep, selling some of them, and marking them in his own mark. The Court however did not lay hold of any one of these circumstances, as sufficient of itself to constitute fraud; but considered that they were all the livery of fraud, and when taken altogether made the sale a fraudulent one. When it is recollected that the case was at the instance of the attorney general, on the crown side of the Court, and how seldom the crown failed at that period in a prosecution, I think this case would not have been entitled to much weight, even if it had have laid down the broad doctrine contended for, which it does by no means do, so far from it that it only calls the possession with the vendor a badge of fraud.

*a* 3 Coke 87.

There are many conveyances that would be held fraudulent under the bankrupt laws, that would be good under the 13th Elizabeth. Bankrupt laws are made for the benfit of trade, and operate on traders only, and not on the mass of the community. The trader carries on his business, and obtains a credit on the faith of his visible stock, and he is not permitted to make a secret transfer of his property; in fact such a transfer would be an act of bankruptcy, and the property so transferred could be recovered by the assignees of the bankrupt; a man variously indebted may convey all his property to a particular creditor whose

debt covers its value without violating the 13th Elizabeth. But if he is a trader, such a conveyance will be against the policy of the bankrupt laws, and would be an act of bankruptcy, and void.[a]

In a case arising under the bankrupt act of the 21st James the 1st, Lord Mansfield, after the enumeration of many evidences of fraud, and among others the possession remaining with the vendor, uses this emphatic language: "nay, the not taking possession being *only evidence of fraud*, may be explained."[b] There are a great variety of cases,[c] under the bankrupt laws, sustaining the same doctrine; but not one of them laying down the broad rule, that possession remaining with the vendor is *per se* fraudulent. The case of *Edwards v. Harben*[d] is believed to be the first case decided under the statute of 13th Elizabeth, in which the ground was assumed by the Court, that on an absolute sale, the possession remaining with the vendor is fraud *per se*, and not mere *prima facie* evidence of fraud. This case has been followed by several respectable authorities; but it has been often questioned, and often declared not to be good authority. In *Kidd v. Rawlinson*,[e] Lord Eldon ruled, "that possession remaining with the vendor is only *prima facie* evidence of fraud." And long afterwards in the case of *Lady Arundel v. Phips et al.*[f] he was much displeased that the rule he had laid down in *Kidd v. Rawlinson* should have been questioned, and uses this remarkably strong language: "the mere circumstance of the possession of the chattels, however familiar it may be to say, that it proves fraud, amounts to nothing more than that it is *prima facie* evidence of property in the man possessing, until a title, not fraudulent, is shewn, under which that possession has followed." Indeed nearly all the modern English decisions seem to question, if not wholly reject the strong rule laid down in *Edwards v. Harben*. In the case of *Stewart v. Lomb*,[g] Chief Justice Dallas says that it has been dissented from often. Park, Justice, admits that doubts have arisen as to the extent of the doctrine of *Edwards v. Harben*, Burrough and Richardson, Justices, concur that actual possession is not in all cases necessary to the transfer of chattels, and acknowledge the soundness of the rule in *Kidd v. Rawlinson*, and *Watkins v. Birch*.[h] It appears clear from these cases, that if the rule in *Edwards v. Harben* has not been wholly subverted, it has been much shaken, and is far from being acquiesced in as good authority.

The Supreme Court of the United States, in the case of.

JULY 1829.

Hobbs
v.
Bibb.

[a] Roberts on Frauds 492.
1 Burr. 407.
Douglas 282.

[b] 1 Burr. 484.
[c] 1 Ves. 343.
1 Atk. 165.

[d] 2 Term R. 587

[e] 2 Bos. and Pull. 59.

[f] 10 Ves. 146

[g] 1 Brod. and Bing. 506.

[h] 4 Taunt. 828.

JULY 1829.

Hobbs
v.
Bibb.

a 1 Cran. 309.

b 19 John. 221.
c 3 Cowen 166.

d 2 Kent's
Com. 404, 410.

*Hamilton v. Russell,*[a] acknowledged the authority of *Edwards v. Harben,* and that decision is considered as settling the law in the Federal Courts. The same rule obtains in Virginia, S. Carolina, Tennessee, Kentucky, Pennsylvania, and N. Jersey. In N. York, possession remaining with the vendor is ruled to be only *prima facie* evidence of fraud. -[ See *Ludlow v. Hurd,*[b] and *Bissell v. Hopkins,*][c] In the last case the point was argued with great ability, and the reporter has with great industry and research, collected all the cases of exception to *Harben v. Edwards.* The same doctrine is sustained in Massachusetts, N. Hampshire, and N. Carolina. From all of which it appears that the question is not well settled in this country, perhaps more unsettled than in England.

I have said that if the statute had received a settled construction, that it ought not to be lightly set aside; but as I have shewn, so far from uniformity, there has been a great diversity of decision; so much so, that Chancellor Kent calls it "a very vexatious question," and says that the history and diversity of decision on this subject, form a curious and instructive portion of our jurisprudence.[d] Such then being the unsettled state of judicial decision on this subject, we are left to the free and unbiased construction of the statute, uninfluenced and unfettered by previous adjudications. That portion of the statute, material to the investigation of the question under consideration, is as follows: "That every gift, grant, or conveyance of lands, tenements, or hereditaments, goods or chattels, or of any rent, common or profit out of the same, by writing or otherwise, and every bond, suit, judgment, or execution, had or made and contrived of malice, fraud, covin, collusion, or guile, to the intent or purpose to delay, hinder or defraud creditors of their just and lawful actions, suits, debts, accounts, damages, penalties, or forfeitures, or to defraud or deceive those who shall purchase, &c. shall be void, &c."

On reading this statute it does seem that the unsophisticated mind would be much at a loss to imagine, by what possible artificial rule of construction invented by the ingenuity of man, a contract entered into with good faith, and for a fair and valuable consideration, could be brought within its proscriptive influence. He would at once say that the statute forbids no honest transaction, it only proscribes fraud. The intention of the parties to the contract is not, nor can it, for a moment, be called a question of law; it is clearly one of fact to be determined by the jury.

How, then, can the Court assume on itself to say that if the possession remains with the vendor, it is conclusive evidence of fraudulent intent, not to be controverted by any testimony to shew the fairness of the transaction? It is contrary to the genius of our government, and against express legislative enactment, that Courts should encroach on the peculiar privileges of the jury, in determining on the facts of a case. A long course of practice in England has sanctioned such encroachments in her Courts. It is not unusual for the Judges there to arrest a cause from the jury, by declaring that the evidence offered is not sufficient to prove the facts averred and put in issue by the plea, and either direct a nonsuit, or order a subservient jury in the box to return a verdict, not on their own conviction of the truth, but according to the wishes of the Judge. Such assumptions of authority render the boasted trial by jury a mere farce. This is an evil that has, to some extent, crept into the judicial tribunals of our own country, from too close an adherence to English authority. Its influence has been irresistible in some of the States; and I can but think, with all due respect for the supreme judiciary of the United States, that it has no where been more perceptible than in *Hamilton v. Russell.* That decision is confessedly based on *Edwards v. Harben,* a foundation so frail that if it has not been overruled, it has at least been considered very questionable authority, in the very Courts where it was pronounced. This case, so often questioned, and so often departed from, is the foundation of all the State adjudications that support the same doctrine. In the case under consideration, it does not appear that the plaintiff in execution had been injured by the property remaining in the possession of Estell, nor does it appear that the debt had been contracted, and credit gained on the faith of that possession. If Hobbs had permitted his property to remain in the possession of Estell, without using some means to give publicity to his right, and an innocent creditor had been imposed on by the false colours it enabled Estell to hold out, his property in such case might have been subjected to the payment of another's debt, on the principles of the common law, and the soundest rules of morality.

The charge of the Court was so broad, that it would not even have admitted evidence that Bibb knew of the sale to Hobbs. It rests on the isolated fact, that possession remaining with the vendor, Estell, made the sale void. It should have been in the language of Lord Eldon, that Estell being

in possession, the law would presume that he was the owner, but that this presumption would give way to proof that he was not. The proof of the sale and subsequent hiring should have gone to the jury to determine whether the sale was made with a fraudulent intent or not. Courts can never exercise too much vigilance and zeal, in administering the laws for the preventing of fraud. But that zeal must not seduce them from their proper sphere of action. If sound policy requires that he who has once owned a chattel shall never have possession of it after he has sold it, by hire, loan or otherwise, it is a proper subject for the attention of another branch of the government. Courts should never undertake to distort the words of a statute, to effect any object, however salutary. If they do so, Legislation will be at an end, in the constitutional way, and the whole legislative functions will be swallowed up by the judiciary. The legislative and judicial departments have distinct duties to perform. The Legislature can alone make the law, and it is the exclusive privilege of the judiary to expound it. Let us then not tresspass on the rights and privileges of a co-ordinate department; but content ourselves with expounding what the law is, and not what sound policy requires that it should be.

Judgment reversed and cause remanded.

Judge SAFFOLD having presided below, did not sit.

Judge TAYLOR not sitting.

---

* See the case of Ayres v. Moore, decided in this Court at January Term, 1330; and the case of Richards v. Hazard, at July Term, 1831.