Millard's Adm'rs v. Hall.

---

## MILLARD'S ADM'RS vs. HALL.

24  209
116  229

1. The retention of possession by the vendor of a chattel, if unexplained, is only *prima facie* evidence of fraud, as against creditors, and may be explained; and if the transaction is *bona fide* throughout, and such retention of possession is consistent with good faith and the absolute disposition of the property, the title passes by the contract of sale.

2. An absolute bill of sale of a slave is not required to be recorded, although there is a contemporaneous agreement for the delivery of the slave at a future day.

3. When the facts in evidence show a sufficient explanation of the vendor's retention of possession, the party alleging fraud cannot complain on error

Millard's Adm'rs v. Hall.

that the court referred to the jury the question of their sufficiency. As to what is a sufficient explanation of the vendor's retention of possession.

4. Where slaves are attached, and sold under an order of court as "perishable property," the sale is sufficient to pass the title to the purchaser [LIGON, J., *dissenting*).

5. An order of court directing the sheriff to "proceed to sell" certain property in his hands, which he had attached, and "pay the proceeds into court," is a sufficient authority to him to make the sale, without any process or copy of the order from the clerk.

6. An agreement, of record, that the testimony of a witness "shall be considered as regularly taken," does not prevent an objection to any portion of it containing illegal evidence.

7. To authorize the admission of secondary evidence of the contents of an order of sale made by the court, its existence should be first proved, and its absence accounted for, or its loss established, after the requisite searches had been made for it in the proper office.

ERROR to the Circuit Court of Autauga.

Tried before the Hon. ANDREW B. MOORE.

DETINUE by the plaintiffs in error, as administrators of Nathaniel M. Dillard, deceased, against William T. Hall, for a slave named Big George, alleged to be the property of the plaintiffs' intestate.

On the trial a bill of exceptions was allowed, from which it appears that the plaintiffs claimed title to the negro in the following manner : The plaintiffs introduced the record of a judgment from Mississippi, showing that one Greene, on the 18th day of March, 1848, recovered a judgment against one Thomas Hall, for the sum of about $10,000. The said Greene, on or about the 29th day of March, 1848, commenced an attachment suit against the said Hall, in Dallas County, Alabama, founded upon his Mississippi judgment ; and under the said attachment the negro in question was levied on, and sold as perishable property, by order of the judge of the Circuit Court of Dallas. The record of the attachment suit in Dallas is made an exhibit to the bill of exceptions, and in it appears the order for the sale of the property levied on as perishable ; but the record does not show any process, issued by the clerk of the court in which said attachment was pending, for the sale of the property. The plaintiffs proved, that after the making of the order to sell the property levied on as perishable, the sheriff of Dallas sold the

same, and at such sale Messrs. Bliss & Jones became the purchasers of said negro, and conveyed him to one Abner Jones, who sold and conveyed him to the plaintiffs' intestate.

The defendant claimed title by bill of sale from Thomas Hall directly to himself, which is as follows: "Received of William T. Hall nineteen hundred and fifty dollars, in full purchase money for four negroes, to-wit: Big George, a man twenty seven years of age, Reuben, a man twenty-three years of age, Avis, a woman twenty-five years of age, Kinchen, a boy twelve years old; and also two mules, one dark mule nine or ten years old, called by the name of Kit, one bay named Pet; which negroes and mules I will warrant the titles good against any claim or claims whatsoever, this the 8th day of March, 1848.

Signed in presence of ⎰ [Signed]   THOMAS H. HALL.
J. C. WRAY.   ⎱

N. B. The above named negroes and mules are to be delivered up to William T. Hall on the 1st day of December next. this the 8th day of March, 1848.

Test: ⎰ [Signed]   THOMAS H. HALL.
J. C. WRAY. ⎱

The plaintiffs showed, that their intestate had possession of the negro, and took such possession with the conveyance of the title from the said Abner Jones; that he held said slave for some time, when the defendant got possession of him, and had held said possession until the commencement of this suit, and to the present time. The plaintiffs introduced evidence tending to show, that Thomas H. Hall had, for a number of years before 1848, been the owner of the slaves levied on, and amongst others the one in question; that he resided in Alabama a number of years, but in 1845 removed to Mississippi, where his negroes, more than twenty in number, remained until the latter part of December, 1847, when they were secretly removed back to Autauga County, Alabama; after said negroes arrived in Alabama, they were placed by Thomas H. Hall on a plantation in Autauga, where he had prepared to make a crop, and during the month of March, 1848, had planted some; that about the latter part of March, 1848, the said Thomas H. received information from Mississippi that Greene had recovered a judgment against him for $10,000, and that said Greene had an agent in Alabama, and in Autauga County, with a view

of taking legal steps to make the money on said judgment ; that as soon as the said Thomas H. acquired the above stated information, he started his overseer, in the night time, with ten negroes, which were afterwards levied on in Dallas, and of which the negro in question was one, instructing him to go to Louisiana, or somewhere west, and do the best he could for him with them. Whilst these negroes were passing through Dallas, in flight, they were seized and levied on in the attachment suit above named. It was shown that no person claimed said negroes when levied on in the manner aforesaid, and that the said Thomas H. had sent them off expressly to get them beyond the reach of Greene's judgment or attachment.

The depositions of one Lovett, and of one Lapsley, were introduced, certain portions of which referring to the contents of the order of sale issued by the clerk of the Circuit Court, were excluded by the court ; to this the plaintiffs excepted. The witness Lovett uses the following language : "The order for selling the negroes was in writing, issued by the clerk of the Circuit Court, and came to the hands of the sheriff in the usual manner. After the sale the order was returned to the office of the circuit clerk ; witness is informed that there is a transcript sent up from the clerk's office of the Circuit Court of Dallas, to be used in evidence on the trial of this case, in which the order inquired of appears, and therefore supposes it is unnecessary for him to attach a copy as requested in this interrogatory."

The defendant, in order to strengthen his title, based as it was on the bill of sale from Thomas H. Hall, as above stated, offered evidence tending to show, that before the date of said bill of sale, the said Thos. H. Hall was indebted to him in a sum more than $2,000. The testimony showed, that there was no delivery of possession of said slaves named in the bill of sale to said William T. Hall, but that they remained in the possession of the said Thomas Hall, under an agreement made at the time of the sale. The testimony tended to show, that Thomas H. Hall had given his note for the reasonable hire of said slaves, during that year, to the first of December ; but there was no proof that said hire, or any part thereof, had ever been paid by said Thomas H. to said William T.

The additional clause to the bill of sale was proved to have

been made at the same time with the main body of it, and formed part and parcel of the same transaction. There was no proof that said bill of sale was ever recorded, or that any effort was ever made to record it. It was further shown, that Thomas H. Hall and William T. Hall were brothers. The testimony also tended to show, that the said William T. Hall knew of the levy of the attachment on the property, a few days after the same was made. There was no evidence tending to show that Greene, or the purchasers at sheriff's sale, had any notice of the claim of William T. Hall. The testimony tended, further, to show that Thomas H. Hall was indebted also as surety for Dixon Hall before March in 1848, and that early in that month the balance of his negroes had been levied on under an execution from Macon County, and were afterwards all sold; that the negroes, after the sale to William T. Hall, by the bill of sale above set forth, were permitted to remain with the said Thomas H., under the contract for hire, to enable him to make his crop for that year.

Upon this evidence, the plaintiffs asked the court to charge the jury:

1. That, if they find from the evidence that there was a private sale of negroes by Thomas Hall to William T. Hall, on the 8th of March, 1848, and there was no actual delivery of the property, and the property was permitted to remain in the possession of Thomas H., and the creditor, Greene, afterwards levied on the property, whilst in the possession of the said Thos. H., without any notice of the sale to William T., and said property was afterwards sold under the levy, and purchased without notice of William T. Hall's claim, then the right of such purchaser at sheriff's sale would be better than that of William T. Hall; which charge the court refused to give, without this qualification: that if the possession of Thomas Hall, after the bill of sale to William T. Hall, was satisfactorily explained, William T. Hall's right, if his purchase was *bona fide*, would be better than those of the purchasers at sheriff's sale; to which refusal to charge, and to the qualification as given, the plaintiff excepted.

2. That the bill of sale, with the addition thereto, being on the same day, and a part of the same transaction, containing a reservation to the grantor, should have been recorded as required

by the statute, and, if not recorded within the time prescribed by law, would be void as to creditors and purchasers without notice, unless the possession of the property had been changed; which charge the court refused to give, and the plaintiffs excepted.

2. That the continuance of the possession of the property by Thomas Hall, after the sale to William, was not sufficiently explained by the facts proven in relation thereto, if the sale was a private one.

4. That the retention of possession of the property, after the sale by Thomas Hall, is not sufficiently explained by the post-script or addition to the bill of sale, stipulating for the delivery of the property at a future time, if the sale was a private one, nor by the fact that the vendor, having prepared his lands for a full crop, desired to retain the negroes, to aid in planting and cultivating the crop, although there was a private agreement to pay hire for the negroes, which was not paid. The court refused to give these charges, on the ground that he was unwilling to instruct the jury as to what was or was not a sufficient explanation of the circumstances of the possession by the vendor, the court preferring to leave that question to the jury; to which refusal to charge, the plaintiffs excepted.

5. The plaintiffs further asked the court to charge, that there was a sufficient order to authorize the sheriff to sell the property levied on under the attachment, and that the sheriff was authorized to sell under the order of the Circuit Court, as set forth in the record from the Circuit Court of Dallas, without any further order or process. This charge the court refused, and charged the jury, that the order of the Circuit Court, without further order or process issued thereon by the clerk, was not sufficient authority to the sheriff of Dallas to sell the property, and that the record from Dallas showed no sufficient authority; that, if the sheriff proceeded to sell under the order of the Circuit Court, as set forth in the record from Dallas, without any other process or order, then the sale was void, and the purchaser at such sale got no title; to which refusal to charge as asked, and to the charge as given, the plaintiffs excepted.

The plaintiffs thereupon took a non-suit, and a bill of exceptions to the several rulings against them; and they now assign for error these several rulings of the court below.

Millard's Adm'rs v. Hall.

WATTS, JUDGE & JACKSON, for plaintiffs in error :

I. 1. An attaching creditor is to be considered as a purchaser.—Coffin v. Ray, 1 Metcalf 212, which is cited with approbation in the case of Ohio Ins. Co, v. Ledyard, 8 Ala. 873 ; also, Shumway v. Rutter, 7 Pick. 56, and the authorities cited by Merrick for defendant.

2. The attaching creditor's rights are superior to those of a secret purchaser, who permits the property to remain in the vendor's 'possession, unless the attaching creditor had notice of the sale, either actual or constructive, before he acquired a lien by his levy.—7 Pick. 56 ; 17 Mass. 110 ; 1 Metcalf 212.— The New Hampshire and Connecticut cases, cited by the counsel for defendant in error, maintain this principle to the fullest extent, and simply say that there was a wrong application of the principle. All these authorities show, that there must be an actual delivery, when it is practicable.

3. In this case, both Wm. T. Hall and Greene were creditors of Thomas Hall ; and he who is most diligent and is least in fault, has the superior right. Now the former, after taking his bill of sale, chose to let Thomas Hall keep possession until Greene attached. Greene had no notice of Hall's purchase, and nothing to put him on inquiry : it was a private sale. and the possession remained unchanged. Nor did the purchaser under the attachment have any notice whatever of William T. Hall's rights, nor was there anything to put him on inquiry : on the other hand, all the facts tended to show to them that Thomas Hall had been, and continued to be, the owner of the property; his possession was the same ; the negroes were in flight, running away secretly, at the instance and request of Thomas Hall ; no claim to the property was interposed by William T. Hall ; his interest was not made known on the day of sale, although he knew of it, and was fully informed of the levy and flight of the negroes.

II. The bill of sale, and the postscript to it, if they are to be regarded as one instrument, reserved an interest to the grantor, and are not good, as against an attaching creditor, or a purchaser without notice. Either actual or constructive notice must have appeared. The deed should have been recorded.

III. 1. But if it was not required to be recorded, then, we insist, the charge asked ought to have been given. The facts

and circumstances did not furnish a sufficient explanation of the vendor's retention of possession after the bill of sale.—Borland v. Planters & Merchants' Bank, 5 Ala. 531, and the long list of authorities there cited.

2. The court erred in refusing to charge the jury as to what was a sufficient explanation of the retention of possession. The facts being ascertained, this was purely a question of law, and the court was bound to charge the jury what was the law.— See Borland v. P. & M. Bank, *supra*, and numerous other cases, mataining that whenever the facts are ascertained, the question is one of law, and not of fact.

IV. As to the charge and refusal to charge, as to the order of the Circuit Court furnishing authority to the sheriff to sell: The order was ample and complete authority, and the sale under it was confirmed by the court in its judgment entry.—Clay's Digest, p. 56, § 8. But if the issuance of a copy of the order by the clerk would have been regular, the sale without the issue of such a copy would be, at most, merely voidable, not void, and the purchaser's title would be valid.—Ware v. Bradford, 2 Ala. 676 ; 5 *ib*. 58; 6 *ib*. 234 ; 4 *ib*. 402 ; Hubbert v. McCollum, 13 *ib*. 282 ; Cogburn v. Spence, 15 *ib*. 549 ; Pollard v. Cocke, 19 *ib*. 193 ; Weir v. Clayton, 19 *ib*. 132.

V. The testimony of Lapsley and Lovett ought not to have been excluded. The agreement of counsel, entered of record, which was given after the testimony was taken, authorized its admission, and the court had no authority to set aside the agreement. But the court did not, in fact, set aside the agreement, but simply construed it in such a way as to exclude the testimony ; and in this construction we say the court erred.

N. HARRIS, *contra* :

1. The conveyance of the negroes, and the promise to deliver them on the first of December written under it, being made at the same time, constitute but one agreement.—Sewall v. Henry, 9 Ala. 24.

2. By the terms of the agreement, the property was to remain in the vendor's possession until the first of December following the sale, under a promise from him to pay hire. His possession, therefore, was consistent with the agreement, and was not a badge of fraud.—Hopkins v. Scott, 20 Ala. 184 ;

Magee v. Carpenter, 4 *ib.* 474; Ravisies v. Alston, 5 *ib.* 303; Dubose v. Dubose, 7 *ib.* 235; Desha, Shepard & Co. v. Scales, 6 *ib.* 360; Ayers v. Moore, 2 Stew. 343; Henderson v. Mabry, 13 *ib.* 718; Mauldin & Terrell v. Mitchell, 14 *ib.* 819; Cowper 432; Holmes v. Crane, 2 Pick. 610; 3 *ib.* 257; Long on Sales, pp. 112, 113, 279.

3. The conveyance from Thomas Hall to William was not such a conveyance as the law requires to be recorded: it was upon a consideration deemed valuable in law. The only conveyances of personal property required by our registry acts to be recorded, are: first, conveyances on consideration not deemed valuable in law, where the possession shall not remain with the donee; second, loans, declarations of uses, &c., when possession shall have remained with the loanee for the term of three years; third, deeds and conveyances of personal property in trust to secure any debt or debts.—Clay's Digest, p. 285, §§ 2 and 5.

4. If the agreement to deliver the slaves on the first of December cannot be considered a part of the original contract of sale, then, if the sale and hiring were *bona fide,* and on a sufficient valuable consideration, such hiring is a sufficient explanation of the retention of possession by the vendor.—Hobbs v. Bibb, 2 Stew. 57; 2. Pick. 610; 3 *ib.* 257.

5. If the retention of possession by the vendor was consistent with the terms of the sale; or, if the sale and hiring were *bona fide,* and on sufficient consideration: in either case, the court properly refused to give the third and fourth charges asked by plaintiffs in error, because both of them excluded from the consideration of the jury the *bona fides* of the sale and hiring—facts which were material to the defendant's title.—Nabors v. Camp, 14 Ala. 464; Carlisle v. Hill, 16 *ib.* 406.

6. The declaration of the presiding judge, " that he was unwilling to instruct the jury, as to what was, or was not, a sufficient explanation," &c., was not a charge : it was simply assigning a reason for refusing to give the charges asked ; and, even if the opinion was erroneous, it was no ground for reversal. Green v. Tims, 16 Ala. 541; Phillips v. Beene, 16 *ib.* 720; 8 Porter 142. It is the province of the jury to determine whether the explanation is sufficient.—Henderson v. Mabry, 13 Ala. 715; 9 Conn. 216.

7. The sheriff, being a mere ministerial officer, has not authority to act, in any civil matter, unless some precept or warrant, issued by lawful authority, is placed in his hands, commanding him to do the required act : he cannot act officially, in any civil matter, without process.—8 Bacon's Abr., p. 694, and cases cited ; Hall v. Roche, 8 Term R. 187. The statute under which the order of sale purports to have been granted, requires, by necessary implication, that the order of sale, or some process, shall be placed in the sheriff's hands ; otherwise, how could he be sued for failing to return it ?—Clay's Digest, p. 56, § 8.

8. The order of sale was a nullity, because the facts which authorize a sale of property seized under attachment were not shown to have existed. The seventh and eighth sections of the law relating to attachments, found in Clay's Digest, p. 56, are the only statutes applicable to the case ; and unless they confer authority upon the circuit judges to order a sale of slaves as " perishable property," the authority does not exist. The seventh section declares the nature of the property which may be sold, and the eighth declares the evidence upon which the order of sale may be made, and the proceedings of the officer under the order. It cannot be insisted, that the words "clearly of a wasting or perishable nature," in their common acceptation, include slaves ; and the rule of construction is, that words which are not technical, when used in statutes, are to be understood in their common acceptation. It is evident that the statute was not intended to embrace every species of personal property ; for, if such had been the intention, fit and proper language would have been used. The property must not only be personal, but " clearly of a perishable nature" or "likely to waste, or be destroyed by keeping." Slaves are regarded by our laws as the highest species of personal property, and are even invested with some of the attributes of realty ; and such is the policy of the law in the other slave-holding States. As to what " perishable property" is, see 1 Bouv. Law Dict., " Bona Peritura," p. 200, (2d ed). If lands were sold under such an order as " perishable property," the order would clearly be a nullity, and the purchaser would take no title ; and the same result must follow, if an order was made, under similar circumstances, for the sale of any property not " clearly of a wasting or perishable nature."

9. If the order of sale was a nullity, then no title passed by it, and it may be collaterally impeached.—Wightman v. Karsner, 20 Ala. 453.

10. The evidence offered of the contents of the order of sale, being secondary, was properly excluded.—Boykin, McRae & Foster v. Collins, 20 Ala. 232; Smelser v. Drane, 19 *ib.* 245; Wiswall v. Knevals, 18 *ib.* 65; Yarbrough v. Hudson, 19 *ib.* 654; McDade v. Meade, 18 *ib.* 214; *ib.* 338.

11. The agreement as to the testimony of the witnesses did not authorize the admission of any illegal evidence; and, even if such had been its effect, it was competent for the court to relieve the party from the consequences of it.—1 Green. Ev. 240. It was a matter within the discretion of the court, and therefore not revisable on error.

12. The defendant in error was a purchaser for a valuable consideration.—Ohio Life Ins. Co. v. Ledyard, 8 Ala. 874; Bank of Mobile v. Hall, 6 *ib.* 639.

13. The delivery of the bill of sale was a symbolical delivery of the property, and passed the title.—Long on Sales 279. The case of Lanfear v. Sumner, 17 Mass. 109, cannot be regarded as common law: it is predicated on the rule of the civil law, which requires delivery of the thing to vest title; delivery is not necessary by the common law to pass title. The case is denied to be law in Connecticut (Ingraham v. Wheeler, 6 Conn. 284) and in New Hampshire (5 N. H. 573). It cannot be reconciled with the following cases: Portland Bank v. Stacey, 4 Mass. 663; Putnam v. Dutch, 8 *ib.* 287; Badlam v. Tucker, 1 Pick. 389; Jewett v. Warren, 12 Mass. 300; Joy v. Sears, 9 Pick. 4; Goodwin v. Howland, 2 *ib.* 604; Shumnay v. Rutter, 8 *ib.* 447, and 7 *ib.* 56.

GIBBONS, J.—The first question presented by the present record is, whether actual delivery of personal chattels is essential, in order to complete the contract of sale, and pass the title to property, as respects the creditors of the vendor. As between the vendor and vendee, the simple contract of sale, when complete in all its parts, undoubtedly passes the title; but as respects the creditors of the vendor, when the possession of the chattel remains with the latter after the contract of sale, does the title pass, so as to effect an actual change of prop-

erty? According to the doctrine of this court, as settled at an early day, where the possession of a chattel remains with the vendor, it is, as to creditors, a badge of fraud simply, and not fraud *per se*. Such possession, so remaining with the vendor, unexplained, is *prima facie* evidence of fraud, but still may be explained; and if consistent with good faith and the absolute disposition of property, and the transaction is *bona fide* throughout, then the title passes by the contract of sale, notwithstanding the possession remains with the vendor.—Hobbs v. Bibb, 2 Stewart 54; Ayres v. Moore, *ib.* 336. The doctrine of these early decisions has never been departed from by this court, but has several times been subsequently recognized and followed.— Blocker v. Burgess, 2 Ala. 354; Ravisies v. Alston, 5 Ala. 297; Planters' & Merchants' Bank v. Borland, 5 Ala. 531; Mauldin & Terrell v. Mitchell, 14 Ala. 814. It follows, that there was no error in refusing to give the first charge prayed by the plaintiff, nor in giving to the jury the charge adopted by the court.

2. Neither did the court err in refusing to give the second charge asked. We know of no law, in our State, that requires such a bill of sale to be recorded; and if the defendant had taken the trouble to have had it acknowledged and recorded, his position would, in no respect, have been changed.—Hobbs v. Bibb, 2 Stewart, *supra*. This charge was therefore properly refused.

The third and fourth exceptions, as to the effect of the proof tending to explain the possession of Thomas Hall after the date of the bill of sale to William T. Hall, may be considered together. In each of these requests to charge, the plaintiff desired the court to say to the jury, that the possession of Thomas Hall was not sufficiently explained by the facts offered in evidence. This the court refused to do; and in the latter, the court left it to the jury to say whether the explanation of such possession was sufficient or not. We think there was no error in the refusal to charge as prayed in these requests; nor is there any error of which the plaintiff can complain, in the court's leaving it to the jury to say whether the possession was sufficiently explained or not. In the case of Planters' & Merchants' Bank v. Borland, *supra*, it is said, that fraud is a question of law, after the facts are found. Without calling in question the cor-

governing in rectness of this position, but taking it as the rule the present case, still there is no error of which the plaintiff can complain in the present case, in having the question of fraud left to the jury. The reason is, that, according to the rule as laid down in the case of the Planters' & Merchants' Bank v. Borland, the court should have pronounced upon the question of fraud in the fourth request to charge, and should have stated to the jury, that, on the facts proved, the possession was sufficiently explained. We have no hesitation in coming to the conclusion, that, on the facts set forth in the bill of exceptions, given in evidence in explanation of the possession of Thomas Hall, such possession was sufficiently explained, if the transaction was in all other respects *bona fide*. Leaving this question to the jury, therefore, by the court, was giving to the plaintiffs thereby another chance of a favorable result to them upon the point ; whereas, if the court had done its duty, it would have taken the question of explanation entirely from the jury, and charged that the explanation given, if true, was sufficient, in law, to repel the presumption of fraud. We say nothing of the correctness of the rule as laid down in the case of Planters' & Merchants' Bank v. Borland, and Mauldin & Terrell v. Mitchell, *supra*, but simply follow it ; and by that rule the plaintiffs in error have no cause to complain of any matter in the third and fourth requests to charge. If we were inclined to remodel the rule laid down, it would be made more stringent against the plaintiffs.

4. The fifth request to charge was, that the record from Dallas showed sufficient authority to the sheriff to sell the slaves levied on under the attachment. This the court refused, and charged the jury, that the said record did not show a sufficient authority to the sheriff to sell ; and further, that, if that was the only authority under which the slave in question was sold by the sheriff, then the purchasers at said sale acquired no title. The court further asserted the proposition, that, in addition to the order of sale made by the court, as shown in the transcript of the record from Dallas, there must be a further order or process, from the clerk of the court to the sheriff, to proceed to execute the said order ; and in the absence of such further order or process from the clerk of the Circuit Court of Dallas to the sheriff, the proceedings of the sheriff, in making the sale, were

illegal, his acts void, and the purchasers at said sale acquired no title. In this, we think, the court below mistook the law. The order, when examined, will be found to be, "that, unless the defendant shall replevy such property before the first Monday of July next, the sheriff of Dallas County do proceed to sell the same at the court house door, on that day, on the same notice, and in the same manner, as the law requires other sheriffs' sales to be conducted, and that he pay the proceeds into court, subject to the further order of this court." On examining this order, the statute under which it was made, and the affidavit, necessarily its predicate of the liability of the property to deterioration and waste, we are of opinion that, under the established practice in this State, it was well warranted. The property, at that time, it must be recollected, was in the custody of the sheriff; and the order is, that the sheriff sell it on a certain day, unless it be before that day replevied by the defendant. It is difficult to conceive how the sheriff could have a more direct and positive authority for making the sale, than the order of the court furnishes him. If the clerk had attempted to issue an order of sale to the sheriff, based upon the order of the court, he could only have copied the order, as he would have had no power to add to it, or diminish from it, a single word or line, so far as it was effectual in giving to the sheriff an authority to sell. The sheriff, like the clerk, is an officer of the court, and directly under its control. The court may well, in certain cases, for aught which we can see, give orders directly to the sheriff, for his action in matters pertaining to his duties; and all that the clerk would have to do, in such cases, would be to record the orders and directions of the court; but the clerk could neither direct, control, nor stay the action of the sheriff, where the latter was acting upon orders received directly from the court. The order to sell the property levied on as perishable, we consider as one of those orders where the court acts directly upon the sheriff, and the order is to him to sell, and not to the clerk to issue an order of sale. In the ordinary processes of a final executive character, issuing from courts, it is true, the clerk's signature is absolutely essential to give them validity, or to give to the sheriff authority for his acts in the premises; but that rule would not apply to a case like the one under consideration. The authority of the sheriff is found in

the fiat of the court, ordering him to sell; and if that could not give to the sheriff the power to make the sale, no process which the clerk could have issued could have given it to him.

Our conclusion is, that the order of the court was ample authority for the sheriff of Dallas to make the sale; and that the purchaser at such sale would take under it such title as Thomas H. Hall, the defendant in the attachment, had, at the time of the levy of the attachment.

5. It is difficult to determine what portions of the testimony of the witnesses Lovett and Lapsley were excluded by the court. The particular portion is not set out in the bill of exceptions, although the two entire depositions are made exhibits. That portion of the deposition of Lovett, which we suppose falls within the description of what was said to be excluded, may be found in the statement of the case; but we perceive no portion of the deposition of Lapsley which fills that description. It is insisted, that these depositions should have been read entire, without objection, under the agreement of counsel, of record. But on the examination of the agreement, we do not give to it that interpretation. The language of the agreement is: "And it is further agreed, that the testimony of John G. Lovett, taken by C. C. Pegues, shall be considered as regularly taken." This agreement is not broad enough to admit illegal evidence, if the testimony objected to was of that character.

The testimony ruled out is said to be that relating to the contents of the order of sale. In excluding this testimony, we see no error, inasmuch as, if the order of sale referred to was the one found in the record, it was of itself the best evidence, and should have been left to speak for itself; if it was an order issued by the clerk of the Circuit Court of Dallas, then it was rightly excluded, because the way was not sufficiently paved for the introduction of secondary evidence. The order itself, if such a one ever existed, was the best evidence. If that could not be produced, then its existence should have been distinctly proven, its absence accounted for, or its loss established, after the requisite searches had been made for it in the proper officer. All this proof was necessary, as preliminary to the competency of the proof of the contents of any order of sale not produced. The record does not show that such proof was made, and the secondary evidence was properly excluded. For the error that

intervened, in the ruling of the court upon the sufficiency of the order of sale to confer an authority upon the sheriff to sell the property, the judgment of the court below is reversed, the non-suit submitted to by the plaintiff ordered to be set aside, and the cause remanded.

CHILTON, C. J.—Where a practice has long obtained, and a vast number of titles may fairly be presumed to be dependent upon it, it should require a very clear case to induce the court to depart from it ; and an overruling necessity for the establishment of a different practice should exist, before the court would undermine the foundations of title and set them afloat.

It is always better to let the Legislature, in such cases, apply the corrective : for, in this way alone, can the supposed evil be remedied, without destroying titles which have been acquired in good faith and under the sanction of judicial sales. The fact that the practice has long obtained, in several of the circuits in this State, of selling slaves as perishable property, under certain circumstances, by virtue of the attachment laws, that it has been acquiesced in by the Legislature, and that no attempt has been made to alter it, is persuasive to show, that the practice, in the legislative contemplation, is not opposed to the spirit of the eighth section of the attachment law.

By the law, as it stood when this order of sale was made, the sheriff kept the slaves in jail. Now, it might often happen, that to keep slaves in this manner, pending a long litigation, would, in all human probability, result in their destruction ; thus, it may be, destroying the only means for the satisfaction of the demand sued for, and inflicting an irreparable injury on the defendant. Besides, if the slaves were sick, with a disease which would be so aggravated by being thus kept as to result in their death, it would be most inhumane to them, as well as greatly prejudicial to the parties, to hold that they must be kept until the final decision.

All we hold is, that the order of the court, under the circumstances of this case, is not void, but effectual to pass the title to the purchaser. I do not think such orders should ever be granted, except in cases where the keeping of the property would likely result in its destruction, or great deterioration ;

and in determining these questions, much must be left to the discretion of the court, to be exercised in reference to all the surrounding facts and circumstances.

LIGON, J.—I dissent from the conclusions attained by a majority of the court, as to the construction of the seventh and eighth sections of our attachment laws.—Clay's Dig. 56.

I hold, that the terms "clearly of a wasting and perishable nature," used in the seventh, and "to be likely to waste or be destroyed by keeping," employed in the eighth section of the act, as descriptive of the property which the judge or justice may command to be sold by interlocutory order, before judgment, were never intended by the Legislature to include slaves; nor are slaves necessarily included in them *ex vi termini.*

It will be remembered, that when this statute was passed, (1823,) personal property alone could be levied on by attachment, and consequently the terms were not employed to designate such property generally, but to distinguish one class of it from another; nor were they used to contradistinguish personal property from real estate. The question then arises, Are slaves so "clearly of a wasting or perishable nature," or so "likely to be destroyed by keeping," that we can suppose the Legislature intended to put them in this category? If other acts of that body are entitled to any weight, (and I feel bound to allow them some share in settling this question of intention,) we may safely answer, they did not. That they have been uniformly regarded as the most valuable and permanent of all personal property, by the law-givers of this State, will abundantly appear by the many enactments, whose object is to prevent their sacrifice, when sold by officers under legal process, or by executors and administrators to pay the debts of their testators or intestates.

It is provided, that slaves shall not be sold under execution, when the judgment is for a less sum than $100, if other property is to be found (Clay's Digest 202 § 7). Neither sheriff, coroner, nor constable, shall sell them at any other place than at the court-house of the county, or such other public place as is provided by law; and then, on a more

extended notice than is required on the sale of other chattels ; and in the course of administration, when the other chattels of the decedent have proved insufficient to pay the debts of the estate, it is left discretionary with the Court of Probate, acting for the best interests of all concerned, to sell either lands or slaves for the payment of the remaining debts. In my opinion, these legislative provisions are utterly inconsistent with the idea that slaves were intended to be included in the sections of the law I am now considering.

Apart from this, this court has invested this species of property with attributes which pertain mainly to real property, and which exclude the idea that they should be regarded as of a "wasting and perishable nature," and "likely to be destroyed by keeping." In Price v. Price, 5 Ala. 578, and Williamson and Wife v. Mason, 23 ib. 488, it is held, that a contingent remainder may be limited in slaves; and in McWilliams et al. v. Ramsey, adm'r, at the last term, 23 Ala. 813, we have held them subject to a reversion after the termination of a life estate. I have been unable to reconcile these decisions with the idea that slaves are property, so wasting and perishable in its nature, as to require it to be sold, lest it may become valueless within the ordinary period of litigation in a suit in the Circuit Courts, or before a justice of the peace.

It is, also, a safe rule in ascertaining the meaning of terms employed in a statute, when they are not technical in their character, to give to them the meaning ordinarily attached to them in the community in which the law is to operate, or, in other words, to give to them that sense in which they are commonly received. I am inclined to think, it would be difficult to find a man, outside the pale of the legal profession, who would include slaves in the terms "perishable and wasting property," or "such as will be likely to be destroyed by keeping."

These sections of our law are not such, in my opinion, as to require that the terms used in them should be extended by construction. They are in derogation of the common law, and tend generally to abridge the right of the citizen to his property. Ordinarily, the property of the defendant, in an

action at law, is not subjected to the payment of the demand against him, until that demand is sanctioned and established by the verdict of a jury, and the judgment of a court.— Under these sections of the attachment law, however, it is subject to be taken from him and sold before judgment, and on no better evidence of his indebtedness than the mere affidavit of his pretended creditor. A proceeding so summary, and based upon so unsubstantial a foundation—a foundation which would not be allowed, in our courts, to occupy a place in establishing a demand for more than $100—deserves no favor at the hands of the court; certainly not so much as to extend terms beyond their ordinary import, to sustain it.

If slaves are not included in the terms used in the seventh and eighth sections of our attachment laws, then the court below had no jurisdiction to order the sale of those in controversy. The fact that the plaintiff in attachment takes the oath required by the law, cannot change the nature of the property levied on, or give the judge or justice authority to sell such as is not within the meaning of the statute. Those officers do not derive their power to order a sale from the affidavit of the plaintiff, but from the nature of the property, and the provisions of the law. The affidavit is the means appointed by the statute to bring the levy and the character of the property to the knowledge of the judge; and if one swears that property is perishable, which is not so in fact, the judge should not credit the absurd affidavit and order a sale. If he does, he acts without authority, and his order is null and void.

Such is the case here; and my conclusion is, that the sale made under the order is void, that the purchaser takes no title by his purchase, and that the right of property in the slaves remains where it was before the order and sale were made.

The practice under this statute by the judges of the Circuit Courts, it is said, generally conforms to that adopted in this case. I know that this practice is not universal. But were it so, I would not sanction it; because I am satisfied that it is erroneous, and that the courts below ought not to be allowed to make rules of construction or practice for this court, but should receive their rules from us.

The fact that claims to property have arisen under erroneous decisions of the inferior courts, is entitled to no weight, for the obvious reason, that whenever one of these *claims* arises, some other person has been illegally deprived of his *right*, who is much more entitled to the protection of this court.

NOTE by Reporter.—After the delivery of the foregoing opinions, the counsel for the defendant in error made application for a re-hearing; and in support of his application he submitted the affidavits of several attorneys of this court, stating that they had never known slaves to be sold as "perishable property" under the attachment law, and that the practice of the Bar, so far as their experience extended, did not warrant such orders. On this application the following opinions were pronounced:

GIBBONS, J.—In this case, an application is made for a rehearing, predicated upon a supposed error into which the court fell in the opinion delivered in the cause, in recognizing the doctrine as correct that negroes can, in any case in attachments, be sold on the order of a judge as wasting or perishable property, under the acts of our Legislature, found in Clay's Digest, page 56, §§ 7 and 8.

In the opinion delivered by a majority of the court, the doctrine above stated was recognized simply, but no attempt was made to argue the question. The member of the court who prepared the opinion delivered by the majority, deemed it sufficient to base his conclusion upon this point upon his own observation and experience, both at the bar and upon the circuit court bench. Inasmuch, however, as there seems to be a different understanding as to the practice in different portions of the State, amongst members of the profession, and inasmuch as one member of the court has deemed it his duty to dissent from the conclusion attained by a majority in the opinion pronounced, we deem it proper to consider the question as one entirely new, and to discuss it, by itself, upon principle independent of any practice in any portion of the State. Thus regarding the question, we are free to announce, in the commencement of the discussion, that our subsequent examination and reflections upon the subject have but confirmed the majority of the court in the correctness of the doctrine announced in their first opinion.

The question is, can negroes, in any case, be sold under our attachment laws, above cited, by the order of a circuit judge, " as perishable property" or as property liable to waste or be destroyed by keeping? It has been well remarked, that we have but two legislative provisions upon the subject, and those are the ones cited above, viz., sections 7 and 8 of Clay's Dig., page 56. The former section provides for the issuance of the attachment process, on debts not yet due, and in that case, the words of the act are: " But if the property so attached be clearly of a wasting or perishable nature, then the same shall be sold," &c. As this language is used in reference to attachments issued on debts not yet due, it would doubtless have to be confined in its construction to the precise case made by the statute, and would not be applicable to any other. The eighth section seems to contain the general law, and is the one applicable to all cases other than that provided for in the seventh section.

The language of the eighth section is: " When any estate attached shall, on the oath of the plaintiff, his or her attorney, or agent, or other credible person, be certified to any judge, or justice of the peace, to be likely to waste, or be destroyed by keeping, and if the person to whom it belongs, his or her attorney, agent or factor, shall not, within twenty days after the levy of the attachment, replevy the same, then such estate shall, by the order of said judge or justice, be sold," &c.

The language of this act is: " When any estate attached shall be certified to be likely to waste or be destroyed by keeping." It will not be contended, we apprehend, that there is anything in this phraseology which, in itself, necessarily excludes slave property. The term " any estate" may well comprehend all property upon which a levy may be made. If, therefore, slave property is exempt, it must be because it is not comprehended within the spirit and scope of the statute. This is the precise question that we propose to discuss.

Let us look, for a moment, at the obvious intent and design of the statute. The Legislature has provided a summary remedy for the collection of debts, in cases where, by the ordinary process, there would be no remedy at all. It has authorized the seizure of goods and chattels as the leading process in the cause, and has also provided for the replevy of the goods so

seized and attached. But there is a case not yet provided for; and that is, where the goods are not replevied, and by keeping them in the hands of the sheriff or other officer, they will yield no fruits to the suitor. The statute then provides a remedy for that case, and permits them to be sold, and the money brought into court. We think it may safely be asserted, that the object and design of the statute was, as well to protect the attaching creditor, and give him a fruitful remedy against his debtor, as to protect the debtor, and prevent the sacrifice of his property without accomplishing the payment of his debt. Both the creditor and debtor have an equal interest in the sale of the property falling within the scope of the statute, as it pays the debt on the one side, at the same time that it deprives the other of the property. But for this law, the debtor would often be deprived of his property, whilst the debt for which the attachment was issued would be left unpaid.

Keeping in mind this object and intent of the statute, let us advance now to the inquiry into the meaning of the terms "likely to waste or be destroyed by keeping." These terms are obviously susceptible of two constructions : the one, the strict construction, meaning those articles only which are in themselves perishable, and contain within themselves the elements of their own destruction and decay ; as, for instance, ripe fruits, fresh meats, and articles of a similar nature. With this definition applied to the terms, they would necessarily comprehend but very few articles of the vast variety of personal estate liable to attachments. Giving to the terms this rigid construction, it would not matter if it was shown to perfect demonstration that, at the termination of the litigation, the article attached would become utterly worthless to the creditor ; if the expense of keeping until the final judgment and execution would be fourfold the value of the article levied on, unless it contained in itself the element that would necessarily effect its own destruction, no order could be made by any judge or court for its sale.

Take, for instance, a horse, a mule, or live stock of any kind. These could not be brought within the above stated definition, for they are not perishable in that sense of the word, and yet they would destroy themselves twice over, in nine cases out of ten, if they were to be kept by the sheriff, after being levied on

under attachment, until the end of the litigation; and yet no authority is found, under the above construction of the words of the statute, to obtain an order for their sale. If the above construction were to prevail, not one article in one hundred of the vast variety of personal property liable to attachment could be sold, although it might be shown, to the satisfaction of any one, that by keeping it would prove fruitless to the attaching creditor at the same time that the debtor would be deprived of his property.

The other construction of which the terms above mentioned are susceptible, is, that they comprehend all those articles which not only contain in themselves necessarily the elements of decay, but also those which, by being kept by the officer levying upon them, would become fruitless to the creditor, and by consequence an entire loss to the debtor. This construction certainly agrees entirely with our ideas of the object and intent of the statute. Giving to the statute this construction, it will be seen that its terms are quite comprehensive: all that is necessary to be shown is, that the article levied upon is likely to waste or be destroyed by keeping. It need not be shown that it will necessarily waste or be destroyed; but, if it be likely to waste or be destroyed, it may be sold—not one particular article, or one species of articles, but *any estate attached.* This construction of the terms of the statute, we are satisfied, is what the law makers intended by them, and is sanctioned both by sound reason and common sense. Giving to these terms this construction, can they, in any case, comprehend slaves?

We apprehend no one would contend, if a horse or mule was levied on, in a city where the expense of keeping would be some fifteen or eighteen dollars per month, and the ordinary term of pushing an attachment to final judgment was 12 months, that such horse or mule would be considered as not falling within the spirit of the statute, because, before the final judgment, he would have eaten up his value and much more. And why would he be considered as falling within the terms of the act? There may be nothing in his case that would tend to show that he would not out live a dozen such suits. It is not, then, because he has in himself necessary the element of decay and destruction, but because by keeping he would be wasted and destroyed to the plaintiff and defendant, and therefore comes within the spirit of the

statute. The same reasoning is applicable to all cases. If it is shown that by keeping the article it will necessarily become or is likely to become worthless to the creditor, and by consequence to the debtor, then it is embraced by the statute. It matters not, in our opinion, what the subject matter is: it may be cotton bales, live stock, hardware, provisions, or dry goods ; if by keeping them to the end of the litigation, they will prove, or be likely to prove, fruitless to the creditor, he may have them sold, on the order of the judge, according to the statute in such case made and provided.

We would now ask, where is to be found in our law, or in our policy, anything militating against the construction of the act above given ? There is certainly nothing in the act itself, which contravenes this idea, but on the contrary, as we have shown by the terms of the act itself, everything tending to show that no exception was intended to be made of anything whatever. It is conceded, that in the administration of estates, and in the law of executors, in this State, distinctions are made in favor of slave property. But it does not follow from this, that slaves were intended not to be comprehended in the above mentioned terms of the statute. As long as slaves are considered " *property*" and " *estate*," we cannot, by our decision, so legislate as to screen them from the operation of a statute, when the terms which it employs make no exception in their favor. If slaves are to be subjected to the payment of debts, what reason or good sense is there in saying that they should be liable to be lost to the creditor, as well as the debtor, because they are slaves ? It must be recollected that the statute is one designed for the mutual benefit of the creditor and debtor, and every article that is exempted from its operation, when it is levied on and subjected to expense by way of keeping, is to that extent doomed to destruction, so far as the parties litigant are concerned. But it is said, if slaves are to be comprehended in these terms of the statute, it will often operate a great hardship to the debtor, by often causing favorite slaves to be sold at a great sacrifice. We confess we do not comprehend the force of this argument. In the first place, the provision of the statute is for those cases where the party has failed to replevy the property ; and a sale of the property, fairly made under the order of the court, must be considered as favorable to the debt-

or, so far as the price is concerned, at one time as at another ; and if the property is sold before final judgment, instead of after, the debtor is saved all the expense of keeping the property.

But it is insisted, that the attachment may be levied, and property sold, upon a false or spurious claim. This argument proves too much. It goes against the whole policy of the law, as well against those cases clearly falling within the terms of the act, as against those which are doubtful. But, as an answer to this argument, it may be said, that, when an attachment is sued out, the attaching creditor has to give bond and security, to answer in damages for all the wrongs that may result from the wrongful suing out of the same. With this remedy, which the statute has provided, the defendant has in all cases to be satisfied. If it is defective, the Legislature alone can correct the evil.

According to the views which we entertain, there may be cases, where slaves, being levied upon and put in jail, would be as much subject to the statute as any other species of property. If, for instance, in a sickly season, with an epidemic raging in the vicinity of a jail, where were kept slaves in custody under an attachment ; or, if the slaves are so affected by the confinement, or other regimen to which they are necessarily subjected in the hands of the officer, as that they will be greatly deteriorated in value at the termination of the litigation, or, if by the expense of keeping they would become fruitless to the attaching creditor, or be likely to become so, in any and all of the above cases, we consider it entirely proper to obtain an order for their sale, and that such an order is well warranted by a fair construction of the statute.

For these reasons, the application for a rehearing is refused.

LIGON, J.—The reasons assigned by the majority of the court, for refusing to grant a re-hearing in this case, have failed to impress me with such force as to cause me to change my opinion in respect to the construction of the seventh and eighth sections of our attachment laws, under which the sale of the slaves in controversy was ordered.

The reasoning adopted by them would, in my opinion, be much more prevailing than it now is, were it not for the

16

fact, that at the passage of the sections above referred to, personal property *alone* was subject to be levied upon under writs of attachment : so that where the terms "liable to waste or be destroyed by keeping" were used by the Legislature, they were employed to distinguish one class of personal property from another, and not as a distinction between personal property and real estate.

It appears to me, that no other property was intended to be subjected to the speedy sale provided for in those sections, than such as would waste, or be destroyed, by the mere act of keeping, irrespective of the costs and charges incident to having it safely kept until the termination of the suit. Thus, grain ; ungathered, or unpacked cotton ; merchandise on shelves, or in boxes ; woollen goods, subject to be attacked and rendered valueless by insects; provisions; groceries; and numberless other articles of every day possession and utility, which may be readily enumerated, and which, in the aggregate, form a large portion of the personal property in every community, may well be included in these terms; while it would be difficult to extend the words of the statute to slaves, who are intelligent beings, endued, in an eminent degree, with the instinct of self-preservation, and with sufficient reason and judgment to render the promptings of this instinct effectual. While the former class of personal property, from its very nature, must be presently used, or disposed of, in order to prevent deterioration in state and value, the latter may remain for years not only uninjured, but often increasing in value. The idea of permanence in state and value, when applied to personal property, must always be relative, and not absolute.

The words of the statute necessarily imply a comparison, as to permanence, between several classes of *personal* property : while they assert, in terms, that one class is likely to waste, or be destroyed *by keeping*, they impliedly admit the existence of another class which is not. The opinion of the majority of the court, in effect, destroys this distinction, and cannot, therefore, be a correct exposition of the statute under review.

I have said, that when the seventh and eighth sections of our attachment laws were enacted, *real* estate was not sub-

ject to levy by attachment. This may be seen by examining Clay's Digest, p. 56, § § 7, 8, and p. 60, § 29. The two former sections existed in 1833, while the latter was enacted in 1837 ; so that the terms used in sections seven and eight could have had no reference whatever to the distinction between real estate and personal property. The majority of the court seems not to attach any importance to this consideration, as it is unnoted in their opinions. Their sweeping definition includes all personalty, and thus renders the words used in the seventh and eighth sections meaningless and absurd. To this view I cannot assent. I regard them as descriptive of a certain class of personal property, which is easily ascertained, and I desire to give them effect, as well as to put down abuses practiced under them.

For these reasons, and those set out in my dissenting opinion heretofore delivered in this case, I think a re-hearing should be allowed.