## HARRIS *vs.* PARKER.

[FINAL SETTLEMENT OF ADMINISTRATOR'S ACCOUNTS.]

1. *Sale of perishable property; sufficiency of petition.*—Under the statute authorizing the probate court to order a sale of personal property belonging to a decedent's estate, when "liable to waste, or of a perishable nature," [Session Acts, 1853–4, p. 45; Revised Code, § 2067,) it is not essential to the validity of the sale, when collaterally assailed, that the administrator's petition should allege that the sale "would be beneficial to the interests of the estate," though that fact is required to be proved.

2. *Same; same.*—An averment in the petition, in such case, that the property "is of a character liable to waste, or be consumed by fire," is a substantial compliance with the requisitions of the statute, and is sufficient to sustain the jurisdiction of the court to order the sale.

3. *Private sale by administrator, under order of probate court.*—*Semble,* that under the provisions of the Code, a private sale of property by an administrator is unauthorized, except in the particular cases specially provided for. But, when the jurisdiction of the probate court to order the sale has attached, by the filing of a petition containing the essential averments, the order of sale is not void, because it directs the sale to be made privately, as asked in the petition; nor is the sale, made in obedience to such order, void.

4. *Validity of such sale, as affected by administrator becoming purchaser.*—f The fact that an administrator has a secret interest in the purchase o cotton, sold by him under an order of the probate court which is not void, while it may furnish a reason for setting aside the sale on a direct application, does not render it absolutely void.

5. *Same, as affected by allowance of credit, instead of requiring cash.*—The fact that the administrator, in such case, takes from the purchaser a note, with sureties, (instead of requiring cash, according to the terms of the order of sale,) which note is made payable to the mother and guardian of the infant distributees, by and with her approbation, and is received by her as cash, does not render the sale void.

6. *Same, as affected by interests of estate, and conduct of administrator personally.*—The validity of the sale, in such case, is not affected by the fact that, viewed in the light of subsequent events, it does not now appear to have been beneficial to the interests of the estate; nor by the fact that, at the time he applied for the order and sold the cotton under it, the administrator was buying cotton for himself; nor does that fact prove bad faith on the part of the administrator in asking the order.

7. *Liability of administrator for willful conversion, and loss by negligence.* For an intentional conversion of the assets of the estate, an administrator may be charged on final settlement, as a tortfeasor, with their highest value; but, for a loss by negligence merely, he is only charge-

able with the value of the goods at the time of their loss, and interest thereon.

8. *Sale of decedent's stock of goods by administrator.*—To authorize the sale of a decedent's stock of goods under the provisions of the act of February 5, 1858, (Revised Code, § 2074,) it must be affirmatively shown that he "was engaged in mercantile business in this State;" and where neither the petition nor the recitals of the court show this fact, the order of sale is void, and the administrator is chargeable as for a conversion of the goods.

9. *Receipt of Confederate treasury-notes by administrator.*—*Held,* on the authority of *Watson and Wife v. Stone,* (40 Ala. 451,) and subsequent decisions of this court, that under the provisions of the act approved 9th November, 1861, (Session Acts, p. 53,) an administrator was authorized to receive Confederate States treasury-notes in payment of debts due the estate, and for property sold under orders of the court; and that he was entitled to a credit, on final settlement, for the amount of such notes remaining in his hands. (BYRD, J., *dissenting.*)

10. *Allowance of counsel fees to administrator.*—An administrator is entitled to an allowance, on final settlement, for reasonable counsel fees paid by him, for services rendered, except in the maintenance of improper contests with the distributees.

11. *Compensation of administrator.*—Only willful default, or gross negligence, resulting in loss to the estate, (neither of which is shown in this case,) will deprive an administrator of the right to commissions as fixed by law.

12. *Liability of administrator for negligence.*—An administrator should be charged, on final settlement, "in every case in which the estate has been injured, or a debt has been lost, by his failure to sue upon the same within a reasonable time."

13. *Same.*—Where the administrator and his intestate were both stockholders in an insurance company, which was dissolved by resolution, after the death of the intestate, and the assets distributed among the stockholders, the administrator is not chargeable with the assets received by him on such division, unless it is shown that they were delivered to him in satisfaction of his intestate's interest; but he would be chargeable with any loss to the estate, resulting from his failure to prosecute his intestate's right to a share of the assets.

14. *Liability for unauthorized payment.*—*Held,* that the administrator in this case was not entitled to a credit for money which he had collected from the maker of a note held by the intestate, and which he afterwards refunded, on proof that the debtor had once handed the money to a clerk in the intestate's store, with instructions to have it credited on the note, and that the credit never was entered; there being no proof of the clerk's authority to receive the money, and he being solvent.

APPEAL from the Probate Court of Sumter.

IN the matter of the final settlement of the accounts and vouchers of Socrates Parker, as administrator of the

estate of Henry H. Harris, deceased. The intestate died in said county of Sumter, where he resided, on the 1st September, 1862 ; being possessed of a large estate, which consisted of lands, slaves, money on hand, in gold, silver, and bank-notes, more than two hundred and fifty bales of cotton, a great number of outstanding notes and accounts, and a stock of goods, wares, and merchandise ; and leaving his widow, Mrs. Mary S. Harris, and seven infant children, as his heirs-at-law and distributees. Letters of administration on the estate of said decedent were granted by the probate court of said county, on the 13th October, 1862, to said Socrates Parker, who returned a partial inventory of the personal assets on the 9th November, 1862 ; including therein four thousand dollars in gold and silver, about seven thousand dollars in Confederate treasury-notes, and fourteen thousand in notes of various banks in Alabama, Georgia, and South Carolina. On the 17th November, 1862, the administrator reported the estate solvent, and asked an order for the partial distribution of the money on hand ; and the gold, silver, and bank-notes were thereupon distributed under an order of the court. The slaves also, twenty-three in number, were distributed under a subsequent order. On the final settlement of the administrator's accounts, which was commenced on the 28th August, and concluded on the 8th October, 1866, numerous objections were made on the part of the distributees to most of the items in the account as stated by him, and numerous exceptions were reserved by them to the rulings of the probate court in relation to these matters. The great length of the bill of exceptions, which extends through one hundred and seventy-five pages of the transcript, renders it impracticable to state at length the evidence relating to all these matters ; nor is such a statement necessary to a correct understanding of the legal points decided by this court. The material facts of the case, briefly stated, are these :—

On the 13th October, 1862, (the day of his appointment,) the administrator filed a petition in said probate court, asking an order to sell the stock of goods. The petition stated the appointment of the administrator, and then proceeded as follows : " In an examination of the

assets of said estate, your petitioner finds a stock of goods, wares, and merchandise, consisting of ready-made clothing, silks, hats, gloves," &c.; "an inventory and appraisement of which will be returned to your honorable court in a reasonable time. Your petitioner supposes that, at a fair valuation, the same will amount to five or ten thousand dollars. Inasmuch as the articles consist of various kinds, and are much needed by the community, particularly at this time, and many of them in small quantities, your petitioner avers, that it will be greatly to the interest of the estate that the same be sold at private sale. Wherefore he prays your honor to take cognizance of the subject-matter of this petition, and make such order, and prescribe such terms and conditions of the sale as may seem to the court most proper and advantageous to those interested in the estate. Your petitioner would respectfully suggest, that, inasmuch as many of said articles will have to be sold in small quantities, to suit purchasers, it would be best to sell the same for cash."

The court made an order, on the same day, in these words: "This day came Socrates Parker, administrator of the estate of Henry H. Harris, deceased, and filed his application in writing, under oath, for an order authorizing him to sell the goods, wares, and merchandise belonging to said estate, at private sale, for cash. And the court being satisfied that it will be to the interest of said estate that the goods, wares, and merchandise be sold, in the manner, and on the terms desired in said petition, it is therefore considered and ordered by the court, that said petition be granted, and that said administrator is hereby authorized and empowered to sell the goods, wares, and merchandise belonging to said estate, at private sale, for cash; provided that said administrator shall not be allowed to continue said sale as aforesaid beyond the 1st day of March next; and it is further ordered, that said administrator make report to this court of all sales made under this order, in the manner provided by law for making returns of sales of other personal property by an executor or administrator."

The administrator proceeded to sell the stock of goods,

under this order, up to the 1st March, 1863 ; and returned
to the court, on the 21st January, 1864, an account of his
sales, amounting in the aggregate to $5,531 90.    On the
21st January, 1863, however, the administrator filed another
petition in the probate court, representing that a portion of
the goods would remain on hand, unsold, at the expiration
of the period limited by the former order, and asking an
order to sell such residue at public auction ; and  an order
of sale having been granted as prayed, he sold the residue
of the goods, on the 9th March, 1863, for $705 85, and
made return of the sale, on the 21st January, 1864.    In
payment for the goods sold under both of these orders the
administrator received Confederate States treasury-notes,
and he charged himself with the amount of these notes in
his account-current for settlement. The distributees sought
to charge him, on the final settlement, with the value of
these goods, on the grounds—1st, that the orders of sale
were void; and, 2d, that he had no authority to receive
Confederate treasury-notes in payment.    The court over-
ruled these objections, held the orders of sale valid, and
allowed the administrator's account to stand as stated by
him ; to which rulings and decisions exceptions were duly
reserved by the distributees.

On the 27th November, 1862, the administrator filed
another petition in the probate court, which was as follows :
"Your petitioner, Socrates Parker, respectfully showeth,
that he is the administrator of the estate of Henry H.
Harris, deceased, duly and legally appointed ; that he has
in his possession, among the assets of said estate, a num-
ber of bales of cotton, the precise number of which he is
not able at this time to state, owing to the fact that some
part of it, he believes, was purchased by the intestate as
agent for another person, but that the greater part of it
belongs to his intestate, as he has every reason to believe ;
that the property mentioned is of a character liable to
waste, or be consumed by fire ; that he believes he can
realize, at this time, fifteen cents per pound for the cotton
known to belong to said decedent ; and that it would be to
the interest of said estate that so much of it as could be
sold for fifteen cents per pound should be sold for that sum.

Your petitioner therefore asks your honor to take cognizance of the matter, and to order a sale of the same, or such parts of the same, at private sale, and to make such orders and decrees in the premises as will enable your petitioner to act advisedly in the premises."

The court made an order, on the same day, in these words : " This day came Socrates Parker, administrator of said estate, and filed his written petition, under oath, whereby it appears, that among the assets of said estate said administrator has in his hands and possession a number of bales of cotton, the precise number of which he is not able to state; that said cotton is of a character liable to waste, or be consumed by fire, and that it would be to the interest of said estate that so much of said cotton as can be sold at fifteen cents per pound be sold at that sum; and asking an order authorizing him to sell said cotton at private sale. It is therefore considered and ordered by the court, that said petition be granted, and that said administrator be, and he is hereby, authorized to sell so much of the cotton belonging to said estate, at private sale, for cash, as he can sell at fifteen cents per pound; and said petition is ordered to record and file."

Under this order, the administrator sold, on the 15th February, 1863, to M. C. Houston, two hundred and fifty-three bales of cotton, at fifteen cents per pound; and made return of his sales to said probate court, under oath, on the 22d January, 1864; the aggregate price being $19,340 55. Mrs. Harris, the widow of the intestate, claimed one bale of this cotton, under a verbal gift from her husband in his life-time, for the benefit of the "Soldiers' Aid Society;" and the administrator, recognizing the validity of her claim, paid her the price of one bale. The probate court held the evidence insufficient to establish a gift of this bale of cotton, and therefore charged the administrator with its value, which was estimated at seventy-five dollars. The distributees sought to charge the administrator with the value of these two hundred and fifty-two bales of cotton, on several distinct grounds. They insisted —1st, that the order of sale was void; 2d, that the administrator was guilty of bad faith, in asking an order to

sell the cotton, when the interests of the estate did not require a sale, and in selling the cotton at less than its market value, and in being himself interested as a partner in the purchase by Houston. To show the bad faith of the administrator, in asking and making this sale, they adduced evidence showing, or tending to show, that the cotton was worth more than fifteen cents at the time of the sale, and the price steadily increased from that time until the close of the war; that the administrator himself, at the time he asked for and made this sale, was buying cotton on speculation, on his individual account; and that he was openly announced as a partner with Houston in the business of buying and selling cotton on speculation, a few days after the sale of this cotton. The evidence adduced by the parties on these points, as set out in the bill of exceptions, is very voluminous, and an abstract of it is impracticable. The probate court held the order of sale valid, and refused to make any charge against the administrator on the ground of bad faith; to which rulings and decisions exceptions were reserved by the distributees.

This cotton was not delivered to the purchaser until the lapse of nearly a month from the day of sale. Instead of requiring payment of the price in cash, the administrator took Houston's note for the amount, with two sureties, payable to " Mary S. Harris, guardian of the minor heirs of H. H. Harris, deceased." This arrangement was made by and with the consent of Mrs. Harris, who had been previously appointed guardian of her minor children, and who desired by that means to avoid the trouble of lending out the money; and the note was received by her, on a partial distribution of the estate in 1864, as cash. A dispute arose between the administrator and the purchaser, as to the proper date of the note; the former insisting that it should bear date as of the day of the sale, and the latter that the day on which the cotton was delivered was the proper date; and the note was finally dated, by agreement between them, on the 2d March, 1863. These facts were urged by the distributees as additional objections against the sale, and additional reasons for charging the administrator with the value of the cotton; and they reserved

exceptions, also, to the admission of the evidence showing
that the note was taken with the consent of Mrs. Harris.

"J. C. Gillespie testified, that shortly after the sale of
the cotton by the administrator to said Houston, he, accom-
pained by said Houston, went around to the houses of the
several persons from whom said Harris in his life-time had
bought cotton, and carried with him the 'cotton book'
used by said Harris for making entries of the weights,
number of bales bought, and names of the parties from
whom purchased; that the cotton was weighed by him, and
turned over to Houston as fast as weighed; that there were
eight bales at George Norris', which he could not weigh
conveniently, and which he turned over to said Houston
according to the weights in the said 'cotton book;' that there
were five bales mentioned in said book as delivered at
Eppes' warehouse on the river, being part of a lot of twelve
bales, which said Harris had bought in his life-time from
E. S. Bell, and which Bell was to deliver at said warehouse;
that he (witness) weighed seven of the twelve bales at the
warehouse, which were properly marked; that there were
at the same time five other bales at the warehouse, of the
same general appearance as to bagging, size, shape, &c.,
which Eppes refused to give up, because they were not
marked; that one Lipscomb, Bell's overseer, made affidavit
that he delivered twelve bales of cotton for Harris at said
warehouse, five of which were delivered on Sunday; that
he (witness) saw no difference between the five unmarked
bales and the other seven, and believed that they belonged
to the estate of Harris; that he so told Eppes, and after-
wards told said Parker, and also told Parker what the over-
seer had sworn." On this evidence, the court refused to
charge the administrator with the value of these five bales
of cotton; to which ruling and decision an exception was
reserved by the distributees.

The administrator claimed a credit for four hundred dol-
lars (and interest) paid to Geo. L. Kornegay, and produced
as a voucher the receipt of said Kornegay, which was dated
the 11th February, 1865; and appended to which were the
affidavits of said Kornegay and one Haggard, stating the
circumstances under which the money was claimed by

Kornegay. It appeared from these affidavits, and from the testimony of Kornegay on the trial, that the intestate held a note on him, which had been given on a purchase of some land; that, during the life-time of said Harris, Kornegay handed four hundred dollars to one Alexander, who was Harris' clerk in a dry-goods store, and instructed him to have it credited on this note, but the credit was never entered; that Kornegay, when afterwards paying the note to the administrator, claimed a credit for this payment, and the administrator promised to refund the amount, with interest, on the presentation of a proper voucher; that the voucher, with the accompanying affidavits, was accordingly prepared, and the money refunded as shown by Kornegay's receipt. There was no proof of any authority on the part of Alexander to receive the money for Harris, except the fact that he was a clerk in the dry-goods store, and was in the habit of receiving payment of accounts for good sold. It was further shown that said Alexander was perfectly solvent. On these facts, the court allowed the credit claimed by the administrator; to which ruling an exception was reserved by the distributees.

The administrator claimed a credit, as per voucher No. 21, for twenty dollars paid to D. L. Saunders; and, to sustain the voucher, produced the receipt of said Saunders for the payment, accompained by his testimony in court, to the effect that, having hired a negro woman from said Harris in 1862, it was expressly agreed between them that a deduction from the price should be made on account of any loss of time by reason of sickness; and that the twenty dollars was paid by the administrator, by agreement, on account of such loss of time. The court allowed the credit, and the distributees excepted.

By the account as stated and allowed by the court, there was a balance in the administrator's hands of $23,353 10, all of which was in Confederate treasury-notes. The court allowed the administrator an attorney's fee of five thousand dollars, and commissions amounting to more than eight thousand dollars. One half of the commissions, however, by his consent, was to be retained by him out of the Confederate money in his hands. For the balance of such

treasury-notes, $19,049 34, the court refused to render any decree against him, on the ground that they were received by him in good faith, and were valueless. To each one of these rulings exceptions were reserved by the distributees.

The final decree, and all the rulings of the court to which exceptions were reserved, are now assigned as error.

RICE, SIMPLE & GOLDTHWAITE, and COLEMAN, CORNICK & COCKRELL, for the appellants.

W. M. BROOKS, contra.

A. J. WALKER, C. J.—The court below overruled the motion to charge the appellee with the value of certain cotton belonging to his intestate, which he had sold. Several reasons are urged against the correctness of this ruling, which must be examined *seriatim*.

1. It is argued, that the order for the sale of the cotton is void, and that the sale being therefore unauthorized, the administrator has converted the cotton, and is chargeable with its value. The order of sale is made in reference to the third section of the act of 16th February, 1854, (Pam. Acts, p. 45; Revised Code, § 2067,) which is in the following words: "The several courts of probate of this State shall have power to order the sale of personal property, *liable to waste, or of a perishable nature,* belonging to the estate of any deceased person, whenever it shall appear by proof, upon the application of the representative of any such deceased person, that such sale would be beneficial to the interests of such estate."

The doctrine was established in this State in 1838, and has been since sustained, that the jurisdiction of the probate court to make orders of sale, such as those mentioned in that section, is maintained, when an application is made conformably to the statute; and it is now held, that no subsequent irregularities vitiate the sale, and that, in determining the question of jurisdiction, when a collateral assault is made upon the order, the language must be construed favorably to the maintenance of the jurisdiction.— *Wyman v. Campbell,* 6 Porter, 220; *Satcher v. Satcher,* at the last term; *King v. Kent,* 29 Ala. 542; *Hatcher v. Clifton,* 33 Ala.

301; *Wyatt v. Rambo*, 29 Ala. 510; *Matheson v. Hearin*, 28 Ala. 210; *Field v. Goldsby*, 28 Ala. 218; *Doe v. Riley*, 28 Ala. 165.

The ascertainment of the true meaning of this statute is facilitated by a slight transposition of words. Its obvious intent is to give to the probate court power to order, *on the application of the representative*, the sale of the specified character of personal property, *whenever it shall appear by proof* that such sale would be beneficial. The question here is not, whether the petition for the sale would have been good on demurrer. Probably it would not, on the principle that a pleading should aver all that the party is required to prove. The question is, whether the application, which in this case is in writing, made the representation requisite to authorize the court to hear and decide the case. The statute does not require the applicant to represent that the sale would be beneficial to the interests of the estate, but that such fact should appear by proof. The manner in which the fact should appear to the court, is carefully prescribed; and it is not for us to superadd the requisition, that it should appear in another manner. "*Inclusio unius est exclusio alterius.*" There is power to order, on the application of the representative, the sale of certain classes of property; but, after the jurisdiction attaches, in consequence of the application, proof of a particular fact is required. The administrator is not required to represent that the sale would be beneficial, and his failure to do so can not make it void. The authorities above cited clearly show, that the failure to represent such fact, admitting that there was such failure, does not sustain a collateral impeachment of the order. In several of them, there was a clear omission of the court to do things prescribed as preliminary to the order, and an omission to aver them in the initiatory petition; and some of them are made in reference to a law which not only requires proof, but prescribes the mode in which it is to be made. All that is necessary to the validity of the order is, that the application should show the jurisdictional fact. That fact, in this case, is, that the property was liable to waste, or of a perishable nature. Is that shown in the application?

2. The statement of the petition is, that the property was "of a character liable to waste, or be consumed by fire." Liability to waste is one of the grounds of sale; but it is argued, that that ground is not alleged : that the signification of the sentence is, that one of two things is true— either that there is a liability to waste, or a liability to consumption by fire.   This construction of the language might be adopted, if we were bound to construe the word in the sense in which it is used by the best writers of the English language, and thus sacrifice the obvious meaning of the petition.   "*Or*" is defined to be a "connective, that marks an alternative;" "one of two; either; other."  In strict accuracy, such is its signification, (Webster's and Worcester's Dictionaries,) and it would be so understood in demurrers to pleadings.   But it is not always used in that sense.   It is often, in common parlance, and even in written instruments, used in the sense of *both*.   One speaking of a friend, in a city infected with both small-pox and yellow-fever, would scarcely be detected as speaking inaccurately, if he were to say, "my friend is liable to take small-pox or yellow-fever," when he really means that there is an exposure and liability to both.   Our Savior says : " For when two or three are gathered together in my name, there am I in the midst of them;" yet the christian world does not understand that text to imply an assurance of his presence when one or the other of the specified numbers are gathered together, leaving it undetermined which.   On the contrary, it is understood to convey a promise of presence both in a gathering of two, and in a gathering of three—as well in the one as in the other.

There is no word in the English language more difficult to define, or "of more equivocal import, than the" monosyllable *or*.—Burrell's Law Dictionary, "*Or*."  Jarman, in his work on Wills, in reference to the meaning of this word, says : " But by far the most numerous class of cases, exhibiting the change of a testator's words, are those in which the disjunctive *or* has been changed into the copulative *and*, and *vice versa*.   It is obvious that these words are often used, orally, without a due regard to their respective import; and it would not be difficult to adduce instances

of the inaccuracy, even in written compositions of some note. It is not surprising, therefore, that this inaccuracy should have found its way into wills."—1 Jarman on Wills, 420, m. p. 443. It has often been held, both in reference to deeds and wills, for the purpose of effectuating the intention, that *"or"* meant *"and,"* and the instrument was read as if it contained *"and"* instead of *"or."*—*Mallory's Case*, 5 Rep. 111; 2 Hilliard on Real Property, 565, § 12; *Wright v. Kemp*, 3 Term, 470; *Denn v. Keemeys*, 9 East, 366; *Wright v. Day*, 16 East, 67; *Jackson v. Blansham*, 6 John. 54; *Janney v. Sprigg*, 7 Gill, 197; *Ray v. Enslin*, 2 Mass. 554; *Oliver v. Heeney*, 2 Edw. 242; *Carpenter v. Heard*, 14 Pick. 449; *Parker v. Parker*, 5 Metc. 134; *Sayward v. Sayward*, 7 Greenl. 210; *Englefried v. Woelpart*, 1 Yeates, 41; *Turner v. Whitted*, 2 Hawkes, 613; *Beall v. Deale*, 7 G. & J. 216; *Den v. Mugway*, 3 Green, 330; *Ward v. Waller*, 2 Spears, 786; *Den v. English*, 2 Har. 280; *Monroe v. Holmes*, 1 Brev. 319; *Bostick v. Lanton*, 1 Spears, 258; *Kelso v. Dickey*, 7 W. & S. 279; *Butterfield v. Haskins*, 33 Maine, 393. We make so extended a citation of authorities upon this subject, because they prove and exemplify the looseness and confusion which prevail in the use of the conjunctions "or" and "and," and the freedom with which the courts adopt the meaning consistent with reason and intention.

The allegation of the petition, that the cotton was " of a character liable to waste, or be consumed by fire," is nonsense, if it be understood to assert the alternative proposition of liability to the one or the other, but not to both. There is nothing in the *liability to waste*, which opposes a *liability to be consumed by fire*, and nothing in a *liability to be consumed by fire* which opposes a liability to *waste*. Cotton certainly may be liable to waste, and is liable to consumption by fire, and a liability to both may exist at the same time. In common conversation, in a will, and in a deed, the language would be understood to assert a liability both to waste and to fire. Why should it be understood differently in this petition? We could only place a different construction by disregarding our own decisions that such

instruments are to be interpreted in a light favorable to the validity of the order.

Another position has occurred to us, as an answer to the argument that the order of sale is void for want of jurisdiction. It is this, that the assertion of the liability of the cotton is a statement that it is perishable, with a specification of the mode of its perishableness; and that therefore, even if the statement of the petition be alternative, in either alternative the court had jurisdiction. We mention the proposition, and cite authorities bearing upon it, but we pass it by as a point which it is unnecessary to decide.—*Steele v. Wyatt*, 23 Ala. 764; *S. C.*, 26 Ala. 639; *Millard v. Hall*, 24 Ala. 209; *Satcher v. Satcher*, at the last term; *King v. Kent, supra*; *Hamlet v. Johnson*, 26 Ala. 557; *Ozley v. Ikelheimer*, 26 Ala. 332.

It is also objected to the validity of the order of sale that the petition does not represent the cotton to be "liable to waste," in the language of the statute, but "of a character liable to waste." To sustain this position, would require a niceness of verbal criticism, which would scarcely be permissible in the decision of a demurrer to a common-law pleading. The validity of these orders of sale does not depend upon the employment of the statutory language. They will be sustained, if the expressions can, by aid of a favorable construction, be held equivalent.—*Satcher v. Satcher, supra; King v. Kent, supra; Hamlet v. Johnson*, 26 Ala. 557.

3. Another objection to the validity of the order of sale is, that it authorizes a private sale. We are inclined to think, that, because the Code is an entire revision of the law on the subject of sales of decedents' property, and a private sale of crops is expressly authorized, while an advertisement of the time and place of sale is prescribed in most (if not all) other cases of sale; and because the legislature has since authorized a private sale, in the single case of a deceased merchant's goods, that private sales by the representatives of estates, not falling within either of the two excepted cases, and not under a will, are unauthorized by law, notwithstanding there is no express prohibition of

40

such sales.—*Wyatt v. Rambo*, 29 Ala. 510; *Ikelheimer v. Chapman*, 32 Ala. 676, last paragraph. But this we do not decide, because it is not indispensable. It will be conceded, for the purposes of this opinion, but not as a decided proposition.

Under the law as it existed before the adoption of the Code of 1852, private sales of the property, real and personal, of decedents, were held to be void. But in none of the cases was there an order of court, in a case of which it had jurisdiction, *directing a private sale.—Ventress v. Smith*, 10 Peters, 161; *Wier v. Davis*, 4 Ala. 442; *Dearman v. Dearman, ib.* 521; *Fambro v. Gantt*, 12 Ala. 298; *Hopper v. Steele*, 18 Ala. 828; *Lay v. Lawson*, 23 Ala. 377; *McArthur v. Carrie*, 32 Ala. 75, which is in reference to a statute of Mississippi, identical with the former law of Alabama—Hutchison's Mississippi Code, pp. 669, 670, § § 109, 117; *Bragg v. Massie*, 38 Ala. 89. Therefore, the question whether a private sale is void, when made under the authority of a court having jurisdiction of the case, is not *res adjudicata* in this State. Now, it is a principle thoroughly imbedded in the jurisprudence of Alabama, that in these proceedings before the probate court, its erroneous action upon any point arising after jurisdiction has attached, does not render its order or decree for a sale of personalty void. The question whether the sale should be private or public, arose after the jurisdiction attached, and upon the hearing of the cause. As to the power to order a private sale since the adoption of the Code of 1852, no decision has been made by this court. All the decisions are above collected, and refer to sales in this State made before the adoption of the Code; and their validity was, therefore, triable by the previous law. The law of Mississippi, in reference to which one of the decisions was made, was the same with our own law. The statutes before the Code of 1852 expressly declared, that it should be " unlawful" to sell privately, and that the sale should be " at public sale, to the highest bidder." The Code omits thus emphatic and direct prohibition and direction; and the negation of the power to sell privately can only be made out (if at all) by argument, which may, and

Harris v. Parker.

no doubt does, strike the minds of different lawyers with different results. We do not affirm, that a negation of power is the less effective, because it is derived argumentatively; and it is not necessary to do so, for it was never decided, even under the old law, that a private sale of personal property, made in pursuance of an order directing a sale in such manner, was void.

We introduce this contrast of the manner in which the negation of the power of private sale was derived under the old law, and the manner in which it is supposed to be derived under the present law, because, under the latter state of the law, the argument is at least more striking; and for the additional reason, that the decision in *Lay v. Lawson* (p.390) expressly bases the decisions, holding private sales void, on the positive assertion that it is unlawful to make them; and the argument proceeds upon the concession of the propriety of a different ruling, in the absence of that assertion. The case we have before us is this. An administrator in his petition prays an order for a private sale, thus imposing upon the court the inevitable duty of deciding the question of private or public sale; the petition was received; the court thus acquired jurisdiction to decide the question; the question is one about which lawyers and judges may differ; he decides the question, as we must infer, according to the dictates of his judgment, enlightened by all attainable information. It would be truly a destructive doctrine, that his decision upon a question of such a character, falling within the scope of his authority to adjudicate, was absolutely void. It is admitted, that, if the jurisdiction of the case depended upon the publicity of the sale ordered, the law would be different; for an erroneous decision that a fact gives jurisdiction is not enough. But here the jurisdiction had already resulted from the reception of the petition, containing the requisite allegations. From the conclusion that the order directing a private sale was not void, it is a corollary, that the sale made in obedience to it was likewise not void.

4. It is argued, that the administrator had a secret interest in the purchase of the cotton. If so, it is a ground for

setting aside the sale, in a direct application for that purpose, but not for treating it as void for every purpose.

5. For the purchase-money of two hundred and fifty-two bales of cotton, a note with two sureties was taken, payable to the guardian of the decedent's children. This was done with the approbation of the widow, who was the guardian of the other distributees, and who wished to avoid the trouble of loaning the money; and such note was accepted as cash. We can perceive no injury or loss resulting from this act, nor can we perceive any very censurable irregularity in it. Certainly, it does not render the sale absolutely void.—*Lay v. Lawson, supra.*

6. We are of the opinion that the cotton was sold for its value. No charge, therefore, can be predicated of the price at which the cotton was sold. It is contended, however, that it would have been better for the estate, had no sale been made; that the interest of the estate was not consulted in obtaining the order for the sale of the cotton; and that therefore the administrator is chargeable. If the cotton could have been preserved until the war closed, and then saved and sold, the estate would certainly have been benefited. This may be safely pronounced in the light of events after their occurrence. But the question of the expediency of the sale was determinable on the 27th November, 1862, when the sale was ordered, in the light of the manifestations of that time. Who can affirm that a judge, or a trustee, guided by the manifestations of the times, during the period from November, 1862, to February, 1863, unwisely concluded that a sale comported with the true interests of the estate? Who can affirm that, amidst the disorder and convulsions which subsequently ensued, the cotton would not have been lost, if it had been retained in specie? Who can affirm that a judge and an administrator, in November, 1862, were blind to the teachings of the times, which guided and controlled prudent men in the management of their own affairs, when they failed to solve the existing problem of war and politics, and, looking down the vista of time, through the results of battles as yet not fought, and through complications of diplomacy and statesmanship as yet not developed, failed to perceive with the

ken of a prophet that the existing government over them, and its currency, were destined to overthrow? If an administrator is charged for a failure in these particulars, an exaction is visited upon him, *not merely* of *uberrima fides*, but of a sagacity more than human.

The ascertainment of the policy of the petition for the sale of the cotton, and the making of it, constitute a step in the line of the administrator's duty. It was not a departure from the law-appointed line of duty. An administrator may act within the line of his duty, and yet, by bad faith, or the want of care and diligence, render himself liable.—*Clough v. Bond*, 3 M. & C. 491. But, for reasons which we have already given, we can not conclude that the administrator, in petitioning for the sale, has, in reference to the policy (supposed to be now demonstrated) of retaining the cotton, acted in bad faith, or without reasonable care and diligence. The *onus* of proving these imputations of bad fath or a want of care and diligence, when the administrator has acted within the line of his duty, is upon the adverse party.—*Pearson v. Darrington,* 32 Ala. 227, 247, § 9; *Clough v. Bond, supra; Gerald v. Bunkley*, 17 Ala. 170.

The bad faith of the administrator, in seeking the authority to sell, is argued from the contrariety of policy adopted by him in the conduct of his own affairs with that which he adopted for the estate. The proof upon this subject shows that, at the very time when the administrator was proceeding to sell the cotton of the estate, he was buying cotton for himself, and engaged in a partnership for the purchase and sale of cotton on speculation. The fact that he was willing himself to incur, with his own funds, the hazard of a cotton speculation, does not demonstrate the conviction of his mind that it was politic to retain the cotton of a decedent's estate. It is not at all unreasonable, that he should entertain the conviction that his own interest would be promoted by embarking in such a speculation, and yet that the good of the estate required a sale of its cotton. His willingness to incur the hazards of such an operation does not prove that a wise and prudent administrator should have retained the cotton. In so far as the mere making of the sale, in obedience to the

valid order of the court, is concerned, he can not be sub-
jected to charge. The question of the consistency of the
sale with the interest of the estate is by law referred to the
judicial mind, the enlightenment of which by proof is re-
quired by the statute. If the court acted without proof,
or decided incorrectly upon such question, (it not pertain-
ing to the jurisdiction,) the administrator can not be charge-·
able on account thereof. The weight of the eight bales of
cotton at George Norris' seems to have been fixed in the
sale of it by the cotton-book of the decedent. If there is
any ground to charge the administrator on account of his
omission to weigh the cotton, it has not occurred to us.

7. The testimony shows, with reasonable certainty, that
the five bales of cotton, a part of a lot of twelve bales sold
by E. S. Bell to the intestate, which was left by the adminis-
trator's agent in Eppes' warehouse, belonged to the estate ;
and shows very clearly that, if they did not, the warehouse-
man was liable. It further appears that the administrator
was notified of the facts, and apprised of the agent's opin-
ion that the cotton belonged to the estate. The adminis-
trator neither claimed, nor attempted to recover the cotton,
or its value. There does not, however, appear. to have
been *intentional* wrong on the part of the administrator.
There was no complicity by him, so far as we can discover,
in the conversion. He is not presented as a convertor, or
as a willful tort-feasor. His wrong is mere negligence. If
he had converted the property, he might have been charged
by the probate judge with the highest value.—*Hudson v.
Helmes*, 23 Ala. 585. Even if the administrator had sued
for the conversion of the cotton, his recovery of the highest
value would not have been a matter of course, but would
have been a matter left to the jury. We think substantial
justice is satisfied, and correct principles of law consulted,
in charging the administrator,upon the circumstances before
us, with the value of the cotton at. the time of its loss by
negligence, with interest on that value.—*Steele v. Knox*,
10 Ala. 608 ; *Hatchett v. Bozeman*, at the present term.

8. The appellants contend, that the order of sale of a
stock of goods, and the sale made in pursuance thereof,
are void, and that the court below erred in not charging

Harris v. Parker.

the administrator on the hypothesis of the invalidity of the order and sale. If the order of sale is valid, it must be by virtue of the act of 5th February, 1858.—Pamphlet Acts, p. 307; Revised Code, § 2074. It is too clear to be the subject of argument, that there is no other statute to the authority of which it can be referred. The language of the act of 1858, so far as it is necessary to examine it, is as follows : " Whenever any person, engaged in mercantile business in this State, shall die, leaving a stock of goods, wares, or merchandise, and leaving no surviving partner in said business, it shall and may be lawful *for the executor, or administrator of the decedent,* to sell such stock of goods, wares, or merchandise, either at public or private sale, and either at wholesale or retail, upon first obtaining an order for such sale, in the manner hereinafter provided, from the probate court which granted his letters testamentary or of *administration.* To obtain *such order* of sale, *the executor or administrator, applying for such order,* must file in said probate court an application in writing, setting forth with reasonable certainty the kind, quantity, and estimated value of said goods, wares, or merchandise, and any facts or circumstances which may render it necessary or expedient; which application must be verified by oath," &c.

It is obvious that, under this statute, the only person authorized to make the application, is the executor or administrator of a particular *sort* of decedent. The executor or administrator " *of such decedent*" may obtain the order of sale on application. The sort of decedent, whose administrator may obtain an order of sale, is one who was " engaged in mercantile business," and died leaving a stock of goods, wares, and merchandise, and leaving no surviving partner. Neither the petition, nor the recitals of the court, in this case, show that the administrator was the administrator of such a decedent. We understand the decisions on this subject to be, that the jurisdiction of the court depends upon the proper representation by the proper person. The sale of the stock of goods was void, and the administrator must be charged with the value thereof, as if he had wrongfully converted the same to his own use.

9. Personal property of the estate was sold, and debts

collected, and Confederate money taken in payment. This court has held in a series of decisions, commencing with *Watson v. Stone*, (40 Ala. 451,) that under the act of 9th November, 1861, (p. 53,) the administrator stands justified in taking Confederate money. We abide by that decision. The administration in this case commenced after the passage of the act. The administrator was properly exempted from the payment of $19,049 34 in Confederate money on hand.

10. It was right to allow the administrator the reasonable counsel fees paid out for services in resisting an attempt to impose incorrect charges upon him, The administrator should be allowed reasonable fees paid counsel for aid to him officially, except in the maintenance of incorrect positions taken by him in contests with the distributees.—*Smith v. Kennard*, 38 Ala. 695 ; *Pickens v. Pickens*, 35 Ala. 442.

11. We do not think the administrator has been guilty of such willful default, or gross negligence, resulting in loss to the estate, as will deprive him of his commissions.

12. Upon another trial, the probate court should charge the administrator, in every case, in which the estate has been injured, or a debt has been lost, by his failure to sue upon the same within a reasonable time. —*Bondurant v. Thompson*, 15 Ala. 202 ; *Dean v. Rathbone*, 15 Ala. 328.

13. It seems from the evidence that the intestate had stock in the *Livingston Insurance Company*. A partnership, of which the intestate was a member, also had stock in the same company. Parker, the administrator, and a partnership of which he was a member, had stock in the same company. A resolution was adopted for the dissolution of the company, and a distribution of the assets among the stockholders. Two bills of exchange were delivered to the administrator, by the secretary of the company. If it appeared that these bills of exchange were delivered to him in satisfaction of the intestate's interest in the assets, the administrator should have been charged with the same. But such does not appear to have been the case, but the

contrary is inferable from the evidence. If there has been any loss to the estate, in consequence of the negligence of the administrator in prosecuting the claim of his intestate to a share of the assets, he should be charged with the amount of such loss. We do not perceive from the record that any loss has supervened from his negligence, and we do not now see any ground justifying a charge against him in reference to this matter.

14. The probate court erred in allowing voucher No. 54 as a credit. The intestate had a note upon one Kornegay, given for land. The debtor handed four hundred dollars to one Alexander, who was a clerk in the intestate's store. The clerk had no authority to receive the money. The reception of the money was entirely outside of the scope of his agency. It does not appear that the money was ever received by the payee. No credit was entered upon the note. The administrator collected the entire note, and afterwards returned the four hundred dollars, with interest. Upon the proof in the record, which we are informed is all which was adduced, the administrator erred in the payment, and the credit should have been denied him.

There was no error in allowing voucher No. 21, being a credit of $20 paid D. L. Saunders.

Reversed and remanded.


BYRD, J.—I dissent from so much of this opinion as relates to Confederate treasury-notes, and refer to my opinion in the case of *Scheible v. Bacho*, at this term, for my views on this subject.