# Ferguson, *pro ami*, *v.* Lowery *et al.*

*Bill in Equity by Ward to Annul and Vacate Release, &c.*

1. *Guardian and ward ; presumptions as to transactions between, shortly after termination of relation.*—It is neither desirable nor possible to define particularly, what evidence will remove the unfavorable presumption indulged by the courts against transactions between guardian and ward, during the existence of the relation or shortly after its termination, whereby the one derives benefit and the other suffers injury. Much depends on the facts and circumstances attending each case, and in general it may be said that the court must be satisfied that there is an absence of any influence springing out of the relation, and of any violation of duty by the guardian—the act must proceed from the volition of the ward, and he must have full knowledge of its effect.

2. *Same; gifts and release.*—There is no distinction in this respect between a release given by a ward *sui juris*, and gifts or conveyances to a guardian. When the release is purely voluntary, or its consideration grossly inadequate, as compared with the liability discharged, its validity must depend upon the same principles on which gifts or conveyances to the guardian depend.

3. *Confederate treasury notes ; when guardian entitled to credit for.*—A trustee who, in good faith, exercising reasonable diligence, received Confederate treasury notes during the war, in the regular course of the administration of the trust, is not to be held accountable, because they proved valueless by the result of the war.

4. *Release ; when not set aside.*—A release from the ward, even if fraud, actual or constructive, can be imputed to the guardian obtaining it, will not be set aside, if incapable of legal injury to the ward.

5. *Settlements ; when not disturbed.*—The court, while not relaxing the principles requiring courts to look with jealousy and suspicion on transactions between persons standing in a confidential relation, by which the person in whom confidence is reposed, obtains a benefit, to the detriment of the other, declares that sound policy and a due regard for the repose of society alike demand that the courts, in the absence of all traces of actual fraud, should be

VOL. LIV.

slow to disturb settlements voluntarily made, without litigation, by parties standing in confidential relations, to adjust controversies growing out of transactions during the late war.

APPEAL from Chancery Court of Perry.

Heard before Hon. CHARLES TURNER.

The bill in this case was filed by the appellant, Lucy M. Ferguson, against Squire Lowery, her former guardian, and his sureties, to annul and cancel a release executed by her, and to compel a settlement of his guardianship in the chancery court.

The main facts of the case are as follows: In the early part of the year 1857, Lowery was appointed and qualified as guardian of complainant. He received a considerable sum of money in par funds belonging to his ward, which he loaned out with good security. During the war, he collected, in Confederate currency, the money loaned out before that time, and being thereafter unable to reloan it upon good security, invested it in interest-bearing notes, or bonds, of the Confederate States, which perished in his hands, with the fall of the Confederacy. Complainant became of age in December, 1864, and in April, 1866, employed counsel, and instituted proceedings in the probate court of Perry county to compel Lowery to a settlement. About a month thereafter Lowry filed his accounts for a settlement, to which she, by her counsel, filed exceptions. No hearing, or final action, seems to have been had on these exceptions. On the 27th day of February, 1867, she executed to her guardian a formal release from all liability on account of his guardianship. On the 14th day of December, 1870, she intermarried with one Ferguson, her next friend, and this bill was filed 31st of May, 1871. The complainant charged that the release was obtained by fraud and undue influence on the part of the guardian, and in ignorance of her rights in the premises. The answers denied all this, and asserted that the release was the voluntary act of the complainant, after deliberation and with full knowledge of her rights in the premises. The testimony taken by the parties is voluminous, the greater portion of it relating to the circumstances under which the release was executed. It was shown, among other things, that the families of the guardian and ward were related, and that there had been some coldness on the part of some of them toward complainant before the release was executed, and while litigation was pending to hold him responsible for his investments in Confederate money. The complainant, from the time Lowery became her guardian, when she was a small child, resided with her father until his death in 1861, and after that time with her step-mother, both of whom lived in

the same town as the defendants. At the end of the war, the guardian had on hand the identical Confederate money received by him, and the testimony showed that he received it in good faith, and kept it because he was unable to loan it out on proper security. It is unnecessary, however, in the view which the court took of the case, to refer more particularly to the testimony on these points. The chancellor, on final hearing, on the bill, answer and proof, dismissed the bill, and hence this appeal.

W. M. BROOKS, E. W. PETTUS, and J. F. JOHNSTON, for appellant.

JOHN F. VARY, SAMUEL F. RICE, and THOMAS H. WATTS, contra.

BRICKELL, C. J.—The principle which must control in determining the validity of the release, executed by the appellant to her guardian, the appellee, Lowery, when she was in her twenty-fourth year, before a final settlement of the guardianship, is not matter of doubt or controversy. It is not perhaps capable of clearer or more accurate statement than as it is expressed by Judge STORY: " Courts of equity will not permit transactions between guardians and wards to stand, even when they have occurred after the minority has ceased, and the relation become thereby actually ended, if the intermediate period be short, unless the circumstances demonstrate in the highest sense of the terms, the fullest deliberation on the part of the ward, and the most abundant good faith (uberrima fides) on the part of the guardian. For, in all such cases, the relation is still considered as having an undue influence upon the mind of the ward, and as virtually subsisting, especially if all the duties attached to the situation have not ceased, as, if the accounts between the parties have not been fully settled, or if the estate still remains, in some sort, under the control of the guardian."—1 Story's Eq. § 317. The principle is founded on principles of public policy, and general utility, and is extended beyond the legal relations of trust, to all the relations of life, in which confidence is reposed and accepted. It is said to be one of jealousy, founded on the reason that no man should be trusted with power that will give him an opportunity of taking advantage of those who voluntarily or of necessity trust him. The purpose is to prevent the abuse of confidence reposed or arising out of the relation, and to remove all temptation to its perversion to selfish interests. The difficulty lies in the application of the principle to the varying transactions

on which courts are called to pronounce judgment. Generally, when it has been applied, and contracts or conveyances annulled as offending it, some trace of actual fraud or imposition, mingled with the influence of the confidential relation and pervades the transaction. It is enough, however, that the effect of the transaction is to confer on the person in whom confidence is reposed, a substantial benefit, and that the person reposing the confidence, or to whom he owes the duty of protection, sustains a corresponding detriment.

The chancellor, in decreeing against the appellants, following the authority of *Kirby v. Taylor*, 6 Johns. Ch. 242, distinguishes a release given by a ward, *sui juris*, from gifts or voluntary conveyances to a guardian, treating the release as *prima facie* valid, casting on the ward the *onus* of impeaching its fairness. We declined to recognize this distinction at the present term in the case of *Malone v. Kelly*, and after an examination of our former decisions, and other authorities, said: "A trust may be discharged, and the trustee relieved from all liability for his administration of the trust estate, by a release, executed by the *cestui que trust*, who is fully *sui juris*. Such release can not be distinguished from any other contract or agreement into which trustee and *cestui que trust* may enter. If it is made soon after the expiration of the time appointed for the continuance of the trust, and immediately on the emancipation of the *cestui que trust* from the disability of infancy, as was the release now relied on, it will not be sustained unless the trustee shows affirmatively, that it was executed with full knowledge of all the circumstances, after sufficient deliberation, and ample opportunity of investigating all the accounts and transactions connected with the trust." By a release, the guardian may obtain all the benefit, and the ward sustain all the detriment which would proceed from a gift or conveyance. The inducements to an abuse of confidence, and the exercise of undue influence, or to fraudulent practices, to procure its execution, are the same in character and degree as the inducements against which the court guards by the suspicion and jealousy with which a gift or conveyance is viewed. The conservative principle on which the court acts, founded on public policy and general utility, would be directed against form rather than substance, if a release should be distinguished from a gift or conveyance. In *Waller v. Armistead*, 2 Leigh, 14, the case of *Kirby v. Taylor* was pressed on the consideration of the court, and it was said: "Chancellor KENT draws a distinction between a deed giving a gratuity or bounty to a guardian in remuneration of antecedent duty, and a deed of release, acquittance or discharge. He admits that the policy of the

law utterly reprobates the former as being null and void; but, he contends, that a simple release is *prima facie* good, and consequently (as we understand him) will not be set aside unless it be shown to be unfairly obtained. We can not perceive the justness of this distinction. A simple release, by which the guardian is exonerated from accounting, and consequently from paying a just balance which may be in his hands, is as much a gratuity as a direct gift by formal conveyance. It may be as gainful to the guardian and as disadvantageous to the ward as a direct gift would be, and if such a practice were tolerated, it would lead to greater mischief than would result from sanctioning direct gifts or gratuities; for wards might be much more easily induced to grant releases for unascertained balances of unsettled accounts, than to make direct gifts of what they have in their possession and know to be their own." The entire estate of the ward may, as in this case, consist of money, for which the guardian is liable to account, and a release would operate as effectually to impoverish the ward and enrich the guardian, as if the estate consisted of real estate, transferred by the most formal conveyance.

The release may be, as said by Chancellor KENT, an ordinary act, but it is one into which it is the sacred duty of the guardian not to invite the ward, without a just accounting and a full settlement, or the disclosure of every fact necessary to inform the ward of all with which he is parting, and then committing it to his uninfluenced will whether he will enter into the release or not. When the release is purely voluntary, or its consideration is grossly inadequate, as compared with the liability discharged, its validity must depend on the same principle on which gifts or conveyances depend.

When, and by whatever evidence, the unfavorable presumption the court is compelled to indulge against a transaction between guardian and ward, from which the guardian derives benefit and the ward suffers injury, will be removed, it is neither desirable or possible to define more certainly, than to say, the court must be satisfied there is an absence of any influence, springing out of the relation, and of any violation of duty by the guardian. The act must proceed from the volition of the ward, and he must have full knowledge of its effect. Much depends on the peculiar facts and circumstances attending the particular transaction.

It is not necessary, in the view we take of this case, to determine whether this release does not, under the facts, partake rather of the character of a compromise of pending litigation, into which, if the appellant surrendered rights without consideration, she was induced rather by her own desire

[Ferguson, pro ami, v. Lowery et al.]

to preserve unbroken her family relations and affections, than from any imposition or influence of the guardian. Nor is it necessary to scrutinize the evidence, conflicting as it is, in some respects, and determine whether the guardian, by the measure of proof required of him, has supported the release, if it is to be deemed voluntary.

The facts show clearly that the only matter of controversy on which the release operates, is a supposed liability of the guardian, because of his collection during the war, in Confederate treasury notes, of debts, for moneys of the ward, by him previously loaned. The account filed by the guardian in the court of probate for final settlement, in obedience to citation issuing at the instance of appellant, and which had been of file for more than twelve months before the execution of this release, fully discloses the fact of these collections.

The exceptions to it, filed by the appellant, were directed only against the credits claimed for these notes. There was not then, or now, any objection that the guardian did not charge himself with all the moneys he had ever received or ought to have received.

The answer of the guardian discloses to whom the money was loaned, when it was collected, and under what circumstances; and his deposition, subsequently taken, supports the answer. This full disclosure of specific facts in the answer, repeated in the deposition, afforded the appellants ample opportunity to introduce opposing evidence. None has been offered, and it must be taken as uncontroverted, that the moneys of the appellant were properly loaned by the guardian, and subsequently collected, during the war, in "Confederate treasury notes," when they were the only circulating medium at the residence of the ward, the guardian and the debtors, and uniformly received in payment of debts and all other business transactions. The notes were not subsequently used by the guardian, but were kept safely, ready for delivery to the ward when she should become of age, or for investment in her behalf, if it could be made prudently.

The liability of guardians or other trustees, because of a conversion by them of choses in action into Confederate treasury notes during the war, has been the source of much distressing litigation in this court, and the decisions are in irreconcilable conflict. On the 9th November, 1861, the general assembly passed an act authorizing guardians or other trustees to invest trust funds in the bonds or treasury notes of the Confederate States, and to receive them in payment of debts due to them in their representative capacity.—Pamph-

let Acts, 1861, p. 53. The validity of this statute was supported by numerous decisions of this court, and its effect declared to be, the protection of trustees from all liability because of such investments or collections.— *Watson v. Stone,* 40 Ala. 451; *Dockery v. McDowell,* Ib. 476; *Neilson v. Cook,* Ib. 498; *Harris v. Parker,* 41 Ala. 604; *Beasley v. Watson,* Ib. 234; *De Jarnette v. De Jarnette,* Ib. 708; *Owen v. Peebles,* 42 Ala. 338; *Walthall v. Walthall,* Ib. 450; *Hoffman v. Stoudenmire,* Ib. 493; *Ivey v. Coleman,* Ib. 450. These decisions were subsequently overruled, and the statute pronounced void, because violative of the public policy and of the constitution of the United States.— *Hall v. Hall,* 43 Ala. 488; *Houston v. Deloach,* Ib. 364; *Powell v. Boon & Booth,* Ib. 459; *Pitts v. Singleton,* 44 Ala. 363. The supreme court of the United States has concurred in condemning the statute as unconstitutional.— *Horn v. Lockhart,* 17 Wall. 570. The former decisions did not affirm the statute was consistent with the constitution of the United States. That it was violative of the constitution, and its purpose was to aid the Confederate States in the war then being waged with the United States, was admitted. Its validity was affirmed on the theory, that it was the enactment of a government *de facto,* and that acts done under it were valid, and could not be disturbed after the overthrow of that government and the restoration of the authority of the government of the United States.— *Watson v. Stone, supra.* Without reopening the discussion of these questions, we are constrained to adhere to the decision of the supreme court of the United States.

Without the aid of the statute, it was within the line of the duty and authority of the appellee, as guardian, to receive paper currency, the circulating medium employed in all business transactions and usually received in payment of debts, in satisfaction of the debts due his ward; and if, without fault on his part, it subsequently depreciated or became worthless, he is not chargeable with the loss.— *Coffin v. Bramlitt,* 42 Miss. 194; *Weller v. Creswell,* 4 S. C. 353; *Covington v. Leak,* 66 N. C. 365; *Cummings v. Mebane,* 63 N. C. 317. The argument which seems to have been of controlling influence in the later decisions of this court, to which we have referred, is, that Confederate treasury notes was an *illegal, treasonable currency,* vitiating all transactions of which they formed the consideration. If it is admitted such was the character of Confederate notes, the fact remains, that they were the only currency in use when these collections were made. They were issued by and on the credit of a government having "actual supremacy within the territory where they were circulated"—a government to which obedience "in civil and

local matters was not only a necessity but a duty." The
supreme court of the United States, in passing upon individ-
ual transactions had, and contracts made during the war,
while the authority of the Confederate government was dom-
inant, of which this currency formed the consideration, re-
gards them as transactions in the ordinary course of civil
society, and the currency as that of a foreign government
temporarily occupying a part of the territory of the United
States.— *Thorington v. Smith*, 8 Wall. 1. The guardian, in
the receipt of Confederate treasury notes, was violating no
law. He was yielding obedience to a necessity war created,
and submitting to an authority he was incapable of resisting,
and submission to which was a duty.

It was said by Lord COTTENHAM, in *Clough v. Bond*, 3 Myl.
& Cr. 496, that a personal representative, acting strictly
within the line of his duty, and exercising reasonable care
and diligence, will not be responsible for the failure or depre-
ciation of the fund in which any part of the estate may be
invested, or for the insolvency or misconduct of any person
who may have possessed it. Again, that "necessity which
includes the regular course of business in administering the
property, will in equity exonerate the personal representa-
tive." In *Gould v. Hays*, 19 Ala. 595, it is forcibly said by
CHILTON, J.:

"It is the anxious desire of courts of chancery to protect
trustees from harm, who act in good faith, and not to subject
their conduct to the application of such harsh and rigid rules
as to deter all prudent men from assuming fiduciary duties
and relations. The court must also look to the number and
nature of the duties to be performed, and while it will exact
the exercise of that care, diligence and forethought in the
discharge of those duties which a prudent man would bestow
upon his own business of a similar character, it will not be
astute to hunt out and seize upon every slight departure from
the strict line of discretion and good management. Nor
should it look merely at the result, which may be unfavor-
able to the interest of those concerned, and conclude from
thence that the trustee has been guilty of gross negligence
or mismanagement, since it often happens that the best laid
schemes fail of success. Such is the imperfection of our
nature, and the vicissitudes to which we are exposed, that
even the most wary, discreet and prudent are not exempt
from misfortunes and failures."

The duty to be performed by the guardian was the collec-
tion of the debts due the ward. In the performance of that
duty, the law demands the diligence and forethought a pru-
dent man exercises in reference to his own business of a

similar character. Can it be said the appellee was wanting in this diligence, when he pursued the course he had taken in the collection of debts due him individually, and followed the example of prudent and judicious men in the transaction of their business? Was it not a necessity in the regular course of business that he should receive the only currency circulating? The war did not reduce the State to chaos or anarchy—civil society remained, and in fact organized government, commanding respect and obedience. A currency was a necessity, and it was supplied by the government to which "civil obedience on the part of all who remained in it," was a duty. If the ward had been of full age, and the guardian had surrendered to her these debts, and she had been, as she would have been, surrounded by the same circumstances and influenced by the same examples surrounding and influencing her guardian, who will say she would not have received Confederate currency in payment of these debts? It is true, her power over the debts would have been more absolute than that of her guardian, but that which she could have done with prudence, in accepting payment of them, considering her interest only, it is fair, in determining the prudence of the guardian, to consider.

It is not the result alone which is to be considered—trustees are insurers and guarantors of results, only when they depart from the line of duty, or, keeping within that line, are wanting in diligence. The result is the calamity of war, in which a whole people, men, women and children, were alike involved. When the conduct of men is to be passed upon, it is neither just nor equitable to disconnect it from the circumstances surrounding them, and read it in the light of subsequent events only. To-day, when the event of the war and all its disastrous consequences are realized, it is easy enough to discourse of the folly and infatuation of men, who risked all upon the issue of battle and war. If it was folly or infatuation, it was the folly and infatuation, not of individuals, but of a whole people. Men as wise and judicious, of as high integrity and as nice sense of duty as any of the present day, pursuing the line of conduct pursued by this guardian, trusted all and lost all; and it would be a harsh judgment to condemn him as wanting in either good faith or prudence, because he was influenced by and followed their example.—*Myers v. Zetelle*, 21 Gratt. 751. The decisions to which we have referred, charging trustees to whom no bad faith or want of prudence was imputable, because of the collection of choses in action in Confederate treasury notes, have been gradually departed from until they have ceased to be authoritative, and the rule governing on this im-

[Ferguson, pro ami, v. Lowery et al.]

portant question has been settled on this basis. A trustee, who, in good faith, exercising reasonable diligence, received Confederate treasury notes during the war, in the regular course of the administration of the trust, shall not be held accountable, because they may have proved valueless by the results of the war.—*Key v. Jones*, 52 Ala. 238. Applying the principle to this case, the release operates no detriment to the ward and confers on the guardian no benefit the law would not have awarded.

"Fraud, without damage, gives no cause of action; but when these two do concur, and meet together, then an action lieth." If fraud, actual or constructive, could be imputed to the guardian, the release not being productive of legal injury to the ward, would not be avoided. Influence can hardly be undue, when employed to accomplish no other end than that which would follow judicial investigation.

We believe sound policy and a due regard for the repose of society demands that when parties, though standing in confidential relations, have without litigation voluntarily adjusted controversies arising out of transactions during the war, the courts, in the absence of all traces of actual fraud, should be slow to disturb the settlement. While we would not relax the operation of the principle requiring courts of equity to look with jealousy and suspicion on all transactions between persons standing in confidential relations, by which the one acquiring confidence derives benefit and the other sustains injury, it must be remembered, the principle is founded on considerations of public policy and general utility, and in its application much depends on the nature of the transaction assailed. General utility demands there should be a termination of litigation over transactions during the war, under circamstances so different from those now surrounding us, that they can not be justly appreciated.

We may regret the appellant's loss of her inheritance; we can not decree her compensation from her guardian, who in good faith and without any want of diligence, in the stress of necessity war created, administered it in the regular course of business.

The decree of the chancellor, dismissing the bill, must be affirmed.